UNITED STATES, Appellee

v.

SERAFIN SANDOVAL, Private E–2, U. S. Army, Appellant

4 USCMA 61, 15 CMR 61

No. 3001

Decided March 26, 1954

LT COL Edgar R. Minnich, U. S. Army, 1ST LT Joseph B. Axelman, U. S. Army, and Richard M. Hartsock, Esq., for Appellant.

LT COL William R. Ward, U. S. Army, and 1ST LT Donald M. Sukloff, U. S. Army, for Appellee.

## Opinion of the Court

GEORGE W. LATIMER, Judge:

The accused was charged and tried by general court-martial for violations of two articles of the Uniform Code of Military Justice. Charge I alleged the unpremeditated murder of Sergeant John H. Sanders, in violation of Article 118, 50 USC § 712. The two specifications under Charge II alleged that he failed to obey a lawful curfew order and an order prohibiting the carrying of a weapon, except when on official duty, in violation of Article 92, 50 USC § 686. He entered a plea of not guilty to Charge I, but pleaded guilty to the other alleged offenses. He was found guilty as charged and sentenced to be dishonorably discharged from the service, to forfeit all pay and allowances, and to be confined at hard labor for twenty years. The convening authority approved the findings and sentence and a board of review affirmed. We granted his petition for review, limiting our consideration to two issues, namely, whether the law officer erred in instructing on unpremeditated murder; and, whether he was required to instruct on accidental death as requested by defense counsel.

The record shows no substantial conflict in the evidence. At the time the offenses were committed, the accused was a member of the 49th Transportation Truck Company located in Korea.

At about 7:30 on the evening of November 2, 1952, he visited a Korean prostitute, who was known as "Katy" and who lived in a village near Uijongbu, Korea. He talked with her for a short time outside her house but he was not invited in because a sergeant was present in her room. He thereupon left stating he would return later. After arriving at his unit area, the accused consumed some beer and then for a short period of time watched a motion picture which was being shown. After viewing the first reel he left the area without authorization, first arming himself with a carbine. He testified that his purpose in taking the weapon was to get past the guard who, because of the weapon, might think he was on duty. At about 11:00 o'clock on the same night he returned to Katy's house, knocked on the door, and called to her. Because of fear she proceeded out of the house and engaged in a conversation with the accused. She testified that he again left; that he was in an angry mood and she remained outside the door on the porch of her house; that accused returned about twenty minutes later; that he called for the sergeant and shouted "wake up"; that he held the carbine in his right hand and pushed the door open with his left; that the gun was struck against the door post; and, that as it did so the weapon discharged, fatally wounding

Sergeant John H. Sanders who was on the floor in her room.

In a pretrial statement received in evidence, the accused related his version of the events surrounding the shooting as follows: That when he returned to Katy's house at about 11:00 o'clock, he called out to her and she came to the door; that while he was talking to her a 3/4-ton truck came around the corner and stopped; that its occupants asked the whereabouts of a sergeant; that he remembered seeing a sergeant in the house earlier that evening; that he called to the sergeant and started to walk toward the door of the house, carrying the carbine in his right hand; that he took the carbine off his shoulder and that could have been the time when he loaded the weapon; that he took four or five steps toward the shack and heard the report of a gun; that he did not know whether he had his finger on the trigger, but he knew it was his gun that had fired because he felt the kick in his hand; and that he waited four or five seconds and then, hearing a groan, went into the house and found Sergeant Sanders propped against the wall. Accused's testimony on the witness stand varied little from that contained in his pretrial statement.

There is a picture of the house in the record and it can be described as a small shack with two doors apparently leading into two separate rooms. There were occupants in the other room as one enlisted man who was in there testified to having heard a voice order a sergeant out of the house and then three to five minutes later having heard a carbine fire. After the shooting, accused first said that it had been an accident, but he later stated that he had shot the victim because he believed he was a military policeman.

The offense of unpremeditated murder is proscribed by subsections (2) and (3) of Article 118 of the Uniform Code of Military Justice, supra. Those subsections are as follows:

"Any person subject to this code who, without justification or excuse, unlawfully kills a human being, when he—

. . . . . .

 (2) intends to kill or inflict great bodily harm; or

 (3) is engaged in an act which is inherently dangerous to others and evinces a wanton disregard of human life; or

. . . . . .

is guilty of murder. . . ."

At the commencement of the trial and prior to plea, defense counsel made a motion that the charge be made more definite and certain, and that trial counsel be required to elect which theory of prosecution would be relied on by the Government. Trial counsel replied that the Government would rely on Article 118(3) and the law officer asked if that was agreeable to the defense. Defense counsel responded in the affirmative and the case was tried on that theory.

At the conclusion of the trial and in keeping with the theory of the prosecution, the law officer instructed on the elements of unpremeditated murder as follows:

"The court is instructed that, in order to find the accused guilty of the Specification of Charge I, it must be satisfied by legal and competent evidence beyond a reasonable doubt:

 1. That the victim, John H. Sanders, is dead;

 2. That his death was caused by an unlawful act or omission of the accused, as alleged; and

 3. That at the time of the killing the accused was engaged in an act inherently dangerous to others and evincing a wanton disregard of human life.

Engaging in an act inherently dangerous to others, without any intent to cause the death of, or great bodily harm to, any particular person, or even with a wish that death may not be caused, may also constitute murder if the performance of the act shows a wanton disregard of human life. By wanton disregard is meant such disregard as is characterized by a heedlessness of the probable consequences of the act or omission, an indifference that death or great bodily harm may ensue. The court's atten-

tion is invited to paragraph 197f of the Manual for Courts-Martial for a discussion of the offense charged."

We have previously considered the appropriateness of an instruction on unpremeditated murder which is based upon the theory that the accused was engaged in an act "inherently dangerous to others" and evincing "a wanton disregard of human life." In United States v. Davis, 2 USCMA 505, 10 CMR 3, we discussed an instruction which involved that theory. We there stated:

". . . Accordingly, we hold that the conduct within the ban of Article 118(3) of the Code, supra, is only that which is 'inherently dangerous to others' in that it is directed towards persons in general rather than against a single individual in particular—that is, where the actor has evinced a 'wanton disregard of human life' in the general or multiple sense. Since, in this case, the evidence disclosed that accused's wicked acts were directed solely against George Fritz —so that the lives of no other persons were placed in jeopardy—it was manifest error, and in prejudicial degree, for the law officer to open the gate to the court-martial for conviction of the accused under Article 118(3). Although we cannot know that this provided the basis for the conviction returned by the court, so also we cannot be sure that it did not. The error in this regard requires, therefore, that a rehearing be ordered."

Again, in United States v. Holsey, 2 USCMA 554, 10 CMR 52, we applied the rule laid down in the Davis case. There we were again confronted with a set of facts showing that the accused's action was not inherently dangerous to anyone but the victim. The Court's opinion contains the following language:

"In the recent case of United States v. Joe L. Davis (No. 646), 10 CMR 3, decided May 14, 1953, we reviewed the authorities from civilian jurisdictions where statutes substantially similar to Article 118(3) were in effect. Although the holdings are not unanimous, we concluded that the weight of authority lies with the construction that the inherently danger-ous acts must be directed against more than one person and that the reasons relied on in those cases are consistent with the principles of the military judicial system. We there held that the language of Article 118 (3) is applicable only in those cases where the actions of the accused endangered the lives of more than one and the victim received the fatal injury without the dangerous act being specifically directed at him. Our decision in the Davis case, supra, requires a reversal of the conviction in the present case."

The instructions in the case at bar do not suffer from the same infirmities as those mentioned in the previous cases as here there was no confusion of theories. The law officer in this instance narrowed the issues by submitting to the court-martial members only one formula for determining whether unpremeditated murder was established. Therefore, unless the evidence shows that the accused's acts were inherently dangerous to others besides the victim, the evidence is insufficient to sustain a finding on the Government's theory and the conviction for unpremeditated murder cannot stand.

Government counsel contend that the test to determine whether the acts were inherently dangerous to others must be applied to the situation as it was, or appeared to have been to the killer, at the time the killing was committed. It may be that that is the true measuring rod, but we need not go that far in this instance. Although the subsequent investigation revealed that only one person was killed, accused's own version of the incident shows that the killing occurred while he was engaged in an act inherently dangerous to at least two persons. Furthermore, other evidence shows the presence of additional occupants of a flimsily constructed Korean house whose lives were jeopardized. The premise for the foregoing statements is furnished by accused's pretrial statement and the testimony of one other witness. In the former, accused shows the presence of Katy near or in the doorway and the sergeant in the room. He had been to the house on several occasions, knew the place was frequented

by other persons. It was dark and he could not see, yet he fired directly toward the woman and the sergeant, and at least two persons must have been in or close to the line of fire.

It is generally held that a conviction for murder may be predicated upon reckless, wanton and inherently dangerous acts which place the lives of other persons in danger. In ▊ Banks v. State, 85 Tex Cr R 165, 211 SW 217, the court was concerned with finding the necessary element of malice to convict for murder in the first degree where the accused, without apparent reason, fired into a moving train and killed the brakeman. The court there stated:

"One who deliberately uses a deadly weapon in such reckless manner as to evince a heart regardless of social duty and fatally bent on mischief, as is shown by firing into a moving railroad train upon which human beings necessarily are, cannot shield himself from the consequences of his acts by disclaiming malice. Malice may be toward a group of persons as well as toward an individual. It may exist without former grudges or antecedent menaces. The intentional doing of any wrongful act in such manner and under such circumstances as that the death of a human being may result therefrom is malice."

In People v. Jernatowski, 238 NY 188, 144 NE 497, the Court of Appeals of New York, interpreting a statute similar in its terms to Article 118 (3), held that the commission of an act inherently dangerous to others supplied the necessary malice required for a murder conviction. There, the background of the offense was a railroad strike in Buffalo, New York. The deceased, a foreman, had remained on duty and the defendant was a striker. On the night of the killing, the defendant had spent the evening at various resorts, and later he and some companions passed the home of the deceased. The lights were burning and deceased and his family were in the house. Saying something about strikebreakers, and running toward the house, the defendant shot and killed the deceased who was standing by a window.

On appeal the defendant contended there was no evidence of intent to kill. The court held:

"So in this case, when the defendant fired two or more shots into the house where he knew there were human beings, he committed an act which the jury certainly could say was imminently dangerous, and which evinced a wicked and depraved mind, regardless of human life, and which amply supplied the evidence of malice and felonious intent which were charged in the indictment, and proof of which was necessary to establish the crime of murder in the first degree. Therefore, if we were interpreting for the first time the statute under consideration we should hold that an act such as this supplied all of its requirements, and furnished all of the elements of murder as defined by it, although there was no specific intent to kill, but only a reckless indifference whether some one was killed as a natural consequence of the act performed. But as a matter of fact we do not think that we are presented with a new question, but rather, we think that this statute has already been interpreted."

We are not concerned with premeditated or first degree murder, and even though we assume there ▊ was no intent to kill, the acts of the accused evidence a wicked and depraved mind and a reckless indifference as to whom might be killed by the firing of the weapon. When the record is dispassionately reviewed and stated in a way favorable to the findings, we find that the accused was being kidded by his close friends about his relationship with Katy. On the evening in question he was seeking intimacies with her and she refused him admittance because she was in the company of a sergeant. He left in an angry mood. Thereafter, he returned to his unit, drank a few beers, and watched a portion of a movie before again leaving for the village. This time he was armed. He gave a very questionable reason for carrying the carbine, and he fails to assign any reason for loading the weapon which

66

he admits he might have done as he approached the premises. Upon arrival back at the shack, he ordered the sergeant out of the house and then fired in the direction of those who were to his immediate front. It was late at night and so dark he could not see who might be the victim of the fatal slug. It should be obvious that he cared little whose life he endangered. Under all the facts and circumstances, we believe the record sufficient to show that the accused, angered by a previous rebuff, purposefully obtained a weapon, returned, and fired into the house with the malicious intent of killing someone. While he may have intended specifically to kill one particular person, his acts were inherently dangerous to others. Accordingly, we hold the finding of guilty of unpremeditated murder is adequately supported by the evidence.

Finally, the accused contends that under the facts and circumstances of this case, the law officer ■■■■■■■ was required to instruct upon accidental homicide as requested by defense counsel. To develop fully this assignment we direct attention to the fact that the law officer instructed on the elements of involuntary manslaughter and negligent homicide as lesser offenses included within the crime charged.

The instruction, requested by defense counsel and denied by the law officer, reads as follows:

"Homicide by misadventure is the accidental killing of another, where the slayer is doing a lawful act unaccompanied by any criminally careless or reckless conduct. A homicide committed by accident, misadventure, or misfortune is excusable; and, as in other cases of excusable homicide, the slayer is not criminally responsible therefor."

The Manual provides that "A homicide which is the result of an accident or misadventure in doing a lawful act in a lawful manner, or which is done in self-defense, is excusable." Manual for Courts-Martial, United States, 1951, paragraph 197c.

That statement is merely a summary of the principles adopted generally by the civilian jurisdiction. The Supreme Court of Pennsylvania, in Commonwealth v. Flax, 200 Atl 632, citing Corpus Juris, stated the rule as follows:

"Homicide by misadventure (which is excusable) is the accidental killing of another, where the slayer is doing a lawful act, unaccompanied by any criminally careless or reckless conduct. 'Three elements enter into the defense of excusable homicide by misadventure: (1) The act resulting in death must be a lawful one. (2) It must be done with reasonable care and due regard for the lives and persons of others. (3) The killing must be accidental and not intentional, or without unlawful intent, or without evil design or intention on the part of the slayer. All these elements must concur and the absence of any one of them will involve in guilt. Even though the homicide is unintentional, it is not excusable where it is the result or incident of an unlawful act, such as pointing or presenting a gun, pistol or other firearm at another person in such a manner as to constitute an offense under the laws of the state, or unlawfully striking another with an intent to hurt, although not with an intent to kill, or driving an automobile at an unlawful rate of speed.' 30 C.J., page 88, sec. 269.''

We fail to find any fact or facts which reasonably raised an issue of homicide by misadventure or accident. There accused was not performing any lawful act in a lawful manner. The record is clear that he carried a weapon without authorization and in direct disobedience of orders, as evidenced by his plea of guilty to Specification 2 of Charge II. This can hardly be considered a lawful act and while the violation of the order is causally removed from the dangerous acts involved in the killing, it establishes the fact that accused was willing to violate regulations to carry out a plan to use force, if necessary. Moreover, a loading of a weapon, or a failure to ascertain whether it is loaded before pointing and firing it toward the house, is evidence of lack of due care. Assuming that the accused struck the door with the weapon and it discharged for that reason, we still would be re-

quired to hold that that was not the act of a careful man. Carelessly handling a loaded weapon in the presence of others is hardly due care and circumspection. However, the accused stated that he was about four or five feet from the door when the gun fired, and at this point there was nothing other than the pressure of his finger on the trigger which would cause it to discharge.

Furthermore, the law officer, when instructing on the elements of negligent homicide, stated as follows:

"Negligent homicide is defined as unlawfully causing the death of another by simple negligence, that is, by an act or omission which, although not negligent to such a degree as to justify a charge of involuntary manslaughter, nevertheless exhibits a lack of that degree of care for the safety of others which a reasonably prudent man would have exercised under the circumstances."

The court-martial members were thus furnished an opportunity to return a finding based on simple negligence, and this they refused to do. Rather they found more than gross negligence. The requested instruction outlined a complete defense to the crime charged, and all included offenses, and it is contrary to reason to assume that a court-martial would acquit an accused when it pays no attention to authorizations to find included offenses of lesser degrees of severity. In the final analysis, the requested instruction is nothing more than the converse of the theories set out by the law officer in the instructions he gave. See United States v. Bull, 3 USCMA, 635, 14 CMR 53; Berenbeim v. United States, 164 F2d 679, 684 (CA 10th Cir 1947). The lowest possible offense he instructed on required the court to find accused was guilty of negligence; the highest compelled a finding of an inherently dangerous act. Accident is an unexpected act not due to negligence. In order to convict, the court had to find the elements outlined by the law officer and such a finding would negate accident. Accordingly, we find no prejudicial error in the law officer's refusal to give the requested instruction.

**68**

The decision of the board of review is affirmed.

BROSMAN, Judge, with whom QUINN, Chief Judge, joins (concurring in the result):

The Chief Judge and I are clear that we meet a 118 (3) homicide here, and that the law officer did not err in his instructions on unpremeditated murder.

We also agree that the possibility of accident was not reasonably raised by the evidence. Either on the basis of the prosecution's case or the accused's story —as the latter appears in his pretrial statement and in testimony from the stand—we must conclude that his conduct was at least criminally negligent. Thus, no court-martial engaged in doing its duty could have found the killing accidental. To that extent we are in entire accord with Judge Latimer. Indeed we would be able to concur outright were it not for his statement that "the requested instruction [in the instant case] is nothing more than the converse of the theories set out by the law officer in the instructions he gave." In the Bull case, cited by the author of the principal opinion, the defense counsel wholly *failed* to request an instruction on accidental homicide, whereas in the present case such a request *was* duly made.

Pretermitting any question of the duty of the law officer to instruct sua sponte on affirmative defenses, we have held on numerous occasions that, where a general instruction is supplied the court-martial, the burden of requesting elaboration, specification, clarification, or the like, rests on defense counsel. Yet in a situation in which proper clarification is demanded, Judge Latimer would brush aside the request because the offered instruction embraced no more than the "converse" of instructions given. It strikes us that under this view the accused must lose whichever way he turns. The accused is entitled to a requested instruction on a theory of his case—if reasonably raised under the law and the facts.

In saying this, we do not suggest that all requested instructions must be ·

given. Certainly, they need not be if they constitute a mere duplication of those already given. Here we hold only that a request for a proper instruction on homicide by accident or misadventure is not embraced within the principle of duplication. Therefore, we are unable to buy what the author of the principal opinion—by way of dictum—offers for sale on this subject. It may be added that in determining whether a requested instruction might operate to enlighten the court-martial during its deliberations, the law officer should resolve doubts in favor of an accession to the request of the accused.