UNITED STATES, Appellee

v.

JOHN A. DAVIS, JR., Private E-2,
U. S. Army, Appellant

6 USCMA 34, 19 CMR 160

No. 6111

Decided June 10, 1955

Lt Col Edward Duvall, U. S. Army, and 1st Lt Leslie D. Scharf, U. S. Army, for Appellant.

Lt Col Thomas J. Newton, U. S. Army, Lt Col Andrew D. Kane, U. S. Army, and 1st Lt William G. Fowler, U. S. Army, for Appellee.

## Opinion of the Court

George W. Latimer, Judge:

The accused in this case was convicted of assault with a dangerous weapon and communicating a threat, violations of Articles 128 and 134, Uniform Code of Military Justice, 50 USC §§ 722 and 728, respectively. The court-martial sentenced him to be dishonorably discharged, to forfeit all pay and allowances, and to be confined at hard labor for five years. The period of confinement was reduced to three years by the convening authority and that sentence, together with the findings, was affirmed by a board of review in the office of The Judge Advocate General of the Army. The basis of the accused's petition to this Court was the refusal of the law officer to give a requested instruction pertaining to the charge of communicating a threat. We granted review in order to determine whether the instruction was necessary in order fully to instruct the court-martial on that delict.

There is no dispute concerning the facts giving rise to the offense under consideration. At about 11:30 p.m., on July 31, 1954, the accused became embroiled in an argument with one of his tentmates, a Private Harris. The argument became a physical struggle which was cut short by other occupants of the tent, who were disturbed by the fight. After the combatants were separated, the accused threatened to kill Harris and left the tent. He returned almost immediately, armed with a carbine. As he entered the tent, he manipulated the bolt on his weapon, putting a round in the chamber. He then stuck the carbine in Harris' midsection and backed him against the tent wall. After further threats from the accused, Harris grabbed the barrel of the carbine, pushed it aside, lunged at the accused, and a struggle ensued. During the tussle, the carbine fired but the bullet passed harmlessly through the tent roof. After a short period of combat, the accused was subdued by occupants of the tent, taken to a waiting truck, and loaded aboard to be taken to the Provost Marshal's office.

**35**

It was at this point that the accused uttered the threat with which we are concerned. His arrest was directed by the officer of the day and carried out by members of the guard. It is of some significance that Corporal Melton seems to have had an assignment as sergeant of the guard, although he had no duties to perform on the night in question, and was among those present near the truck at the time. It is also important to consider that the accused worked under Melton's direction in their regular duty assignments and that some friction had developed between them as a result of that relationship. As the accused was being placed aboard the truck, he said to Melton, "Melton, I'll kill you; . . . in civilian life or Army life." He added that he was not making the statement because he was drunk but because it was coming from his heart.

At the close of argument, the law officer gave the following instruction specifically on the charge of communicating a threat:

"That at the time and place alleged, the accused, without justification or excuse, wrongfully communicated to Corporal James H. Melton a threat to kill him; and

"That under the circumstances the conduct of the accused was to the prejudice of good order and discipline in the armed forces, or was of a nature to bring discredit upon the armed forces.

"The following definitions are given in connection with the instruction: The term 'communicated to' means to make known to; the term 'threat' means a declaration of one's purpose or intention to do an act which is wrongful."

Upon completion of the charge to the court, the defense requested the following additional instruction, which was refused:

"In connection with specification 2 of Charge II, it must be established that the threats were earnest and not mere idle talk or jest."

The accused asserts that the law officer abused his discretion in refusing to give this instruction but, in the light of this record, we conclude otherwise.

II

The first contention advanced to support accused's position is that an instruction on the elements of this offense is incomplete without including a statement to the effect that the threat must have been made in earnest and not have been idle talk or jest. As authority for this proposition, we are referred to two board of review decisions, United States v. Douglas [CGCMS 19741] 9 CMR 619, and United States v. Nicolas [ACM 7678], 14 CMR 683. These opinions contain statements, in substance, that evidence is admissible to show intent or the state of defendant's mind as to the willful nature of the alleged threat, to negative a contention that he was indulging in idle talk or jest. In the Douglas case, the board of review cited and relied on language from United States v. Reid, 49 F Supp 313 (WD La) (1943). In that case, and in an entirely different setting, the District Court held that evidence put in by the prosecution to show that the accused's sympathies lay with the German cause was admissible because it tended to prove that threats against the life of the President of the United States were made seriously. It dealt solely with evidentiary matters from which willfulness could be inferred, but it did not enter the instructional field. The board of review which decided the Nicolas case, supra, relied on the Douglas case, supra, but it, too, is of no appreciable assistance in solving the problem before us.

In United States v. Sturmer, 1 USCMA 17, 1 CMR 17, we adopted a definition of the term "threat" which was taken from United States v. Metzdorf, 252 Fed 933, 938 (DC Mont) (1918), to the effect that, "A threat is an avowed present determination or intent to injure presently or in the future."

When the instructions given by this law officer are broken down in their essential parts, the court-martial was required to find the following before a verdict of guilty could be returned:

(1) that the threat was without justification or excuse; (2) that it was wrongful; (3) that it was made known to the victim; (4) that within its language the accused declared his purpose or intent to do an act which was wrongful, to wit: kill the victim. Those elements meet the test of our definition, and it is apparent that if the court-martial were to conclude that the accused wrongfully declared an intent to kill, it could not find that the words were spoken in jest or idle banter.

For the foregoing reason, the instructions as given by the law officer were sufficient to meet the minimal standards of military law, but defense counsel urges that the rule announced by us in United States v. Sandoval, 4 USCMA 61, 15 CMR 61, required the law officer to give the offered instruction because it was requested. We believe, however, that counsel overlooks a cardinal principle set forth in that case. █ We quote: "The accused is entitled to a requested instruction on a theory of his case—if reasonably raised under the law and the facts."

The same general rule is found in Marson v. United States, 203 F 2d 904 (CA 6th Cir) (1953), but it is stated in slightly different wording. There the court stated:

". . . it is the law that where a defendant in a criminal case presents a theory supported by the evidence, and the court's attention is particularly directed to it, it is reversible error to refuse to give a charge on such a theory."

When we test the facts of this case by the applicable principles, we conclude there just is no evidence to raise any theory of idle talk, jest, or lack of seriousness. On the contrary, every item of evidence argues persuasively that the accused was in an angry, threatening, and dead earnest mood which exhibited itself in words and deeds. From his first affray to his departure, he was bitter, frustrated, and intent upon criminally assaulting the objects of his animosity. He had just shortly before been in two physical struggles, and there was evidence that in the first encounter he had used a knife on his opponent and threatened to kill him before the two were finally separated. Prior to the second episode, he procured a carbine, loaded it, and returned to battle with his adversary. He backed him against a wall, prodded him in the stomach with the weapon, and uttered further threats against him. Finally he was disarmed, and it was while he was being physically restrained that he spoke the threat against Melton. As to Melton, the record reveals some hostility and ill-feeling on the part of the accused arising out of some previous misunderstandings, and there is room for the inference that this underlying resentment led the accused to single out Melton from among the guards. While we believe we do not lack a sense of humor, we see nothing of a jocular nature in the instant case, and there are abundant facts and circumstances which demand a contrary conclusion. If the accused was not in earnest and was not expressing his present intent, all of the witnesses at trial were given a false impression by his acts, conduct, and demeanor.

III

Appellate defense counsel maintain that the statement was made when the accused was emotionally upset and that it was, therefore, not made in earnest. It seems to us that the converse is clearly true. Threats are most likely to be made while the speaker is in an emotional state, and those are the threats most likely to speak the truth about the speaker's seriousness and to wreak the harm which Congress and the President sought to prohibit in enacting Article 134 and delineating this specific offense thereunder. While words spoken in anger are often regretted upon calm reflection at a later period, this premise does not argue that at the time they were pronounced they did not reflect the then mental attitude of the speaker. Certainly, before we could so hold, there must be some showing in the record that the outward expressions and the observed behavior did not disclose his true intent. Finding no evidence in the record to support the theory set out in the

**37**

requested instruction, we hold there was no duty on the law officer to submit it to the court-martial.

## IV

One further point has been raised. In his instruction to the court-martial ■ cer defined a threat as a quoted above, the law offi- "declaration of one's purpose or intention to do an act *which is wrongful*." (Emphasis supplied.) It is now asserted that the accused was prejudiced since that definition is too broad. While in the abstract there may be some basis for that view, when reduced to this particular instance, no prejudice resulted from the instruction as given. Concededly, under some statutes only those statements are punished which threaten bodily harm or injury. See District of Columbia Code, Title 22, § 22-507 (threats to do bodily harm, bond to keep the peace required); 18 USC § 871 (threats to take life or inflict bodily injury upon the President of the United States). Other statutes, both State and Federal, proscribe threats made to accomplish a specific illegal purpose, such as influencing the action of a public officeholder or a voter, or furthering a kidnapping scheme. Still others prohibit threats of injury to either persons or property in order to achieve certain purposes. Examples of this category among the Federal statutes are 18 USC § 372 (to prevent the accepting or holding of public office); 18 USC § 1503 (to impede a witness); and 18 USC § 1951 (to obstruct or harmfully affect commerce). Under the definition adopted by us in United States v. Sturmer, supra, and reiterated in United States v. Holiday, 4 USCMA 454, 456, 16 CMR 28, a threat to injure a person is within the prohibition of Article 134. It may be conceded for the purpose of the argument that, standing alone, the one paragraph of the instruction might be misleading. However, the evidence disclosed only a single threat against Melton, which involved a promise of injury to a person, and at the beginning of his instruction the law officer made it clear that the wrongful act to be considered was a threat to kill. As we have previously stated, instructions must be viewed as a whole, United States v. Hatchett, 2 USCMA 482, 9 CMR 112; and when so considered, it is clear that these instructions left no possibility that the court-martial members were misled as to what they were required to find in order to convict on this charge.

For the foregoing reasons, we affirm the decision of the board of review.

QUINN, Chief Judge (concurring in the result):

The principal opinion implies that the elements of the offenses charged are the exact converse of ■ jest or idle banter. I do ■ not agree with that conclusion. Consequently, if the evidence reasonably showed that the threat was uttered in jest or banter, I would hold that the law officer erred in refusing to give the requested instruction. United States v. Bey, 4 USCMA 665, 16 CMR 239; United States v. Landrum, 4 USCMA 707, 16 CMR 281. However, there is no showing here that the accused intended the utterance as a joke or that anyone present understood he was joking or engaged in idle banter. See Ragansky v. United States, 253 Fed 643 (CA7th Cir) (1918). The victim testified that the accused communicated the threat to him in a "serious tone of voice." Also a defense witness said that the accused appeared to him to be "pretty mad" when he uttered the words charged. Thus, the law officer did not err in refusing to give the requested instruction. United States v. Sandoval, 4 USCMA 61, 15 CMR 61.

For these reasons, I concur in affirming the decision of the board of review.

BROSMAN, Judge (concurring in the result):

I am as sure as the author of the principal opinion is that, unless reasonably raised by the evidence, there is no duty to instruct on idle talk or jest in a threat communication case. If so raised, however, I am equally certain that such a duty exists.

Here I agree with Judge Latimer

that the evidence did not raise the possibility that the accused spoke jokingly —and also that, in this state of affairs, the presence of a defense request is immaterial. Beyond this I prefer not to go.