UNITED STATES, Appellee

v

MICHAEL D. FEMMER, Specialist Four, U. S. Army, Appellant

14 USCMA 358, 34 CMR 138

*Captain James Joseph McGowan* argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph L. Chalk* and *Captain Charles W. Schiesser.*

*First Lieutenant Thomas E. Towe* argued the cause for Appellee, United States. With him on the brief were *Colonel Bruce C. Babbitt* and *Lieutenant Colonel Francis M. Cooper.*

## Opinion of the Court

QUINN, Chief Judge:

The accused was charged with assault in which grievous bodily harm was intentionally inflicted upon Specialist Five Kerry M. Bradshaw with a surgical razor blade. Notwithstanding the accused's claim of self-defense, which was fully instructed upon by the law officer, a general court-martial, convened at Verona, Italy, convicted him of the lesser offense of assault with a dangerous weapon, in violation of Article 128, Uniform Code of Military Justice, 10 USC § 928. It imposed a sentence which includes a dishonorable discharge and confinement at hard labor for one year. The findings and sentence were affirmed by intermediate appellate authorities.

Before the board of review, the accused contended he was prejudiced by the law officer's failure to instruct the court-martial on the theory that Bradshaw was injured by accident. The assignment of error was opposed by the Government, and rejected by the board of review, on the authority of our decision in United States v Hubbard, 13 USCMA 652, 33 CMR 184. There, as here, the accused contended there should have been an instruction on the effect of accident. We held the accused "deliberately chose not to urge the theory of accident"; consequently, the law officer did not err in omitting the theory from his instructions. *Id.,* at page 655. The accused here maintains there was no such deliberate choice of theory on which the case went to the court-martial. As we read the record of trial, there was, in fact, no theory of accident raised by the evidence to require a separate instruction.

No hint of accidental injury appears in the Government's case. Among other things, it showed the accused and Bradshaw engaged in a conversation outside the noncommissioned officers' club. Suddenly, the accused "started swinging out of a clear blue sky" at Bradshaw. The fight was stopped almost immediately. The accused proceeded to the dispensary and obtained a surgical razor blade. Asked by the corpsman on duty "what he was doing," he said he was "going to kill some son-of-a-bitch." Shortly thereafter, Bradshaw, who lived in the same barracks as the accused went to "[t]alk . . . over" with him the earlier difficulty. As he entered the accused's cubicle, the accused jumped up and began to struggle with him. They "wound up on the floor," with the accused on top. Specialist Nunn thereupon intervened and separated the two.

Bradshaw testified that while he was with the accused on the floor he experienced a "stinging sensation" on his left side. As he got up, he saw he was bleeding. He left the cubicle. The accused started after him but was restrained by Nunn. An examination of Bradshaw disclosed he had two cuts on his chest. There was a small cut near the center. The other ran from the left side of the chest, "completely around [the side of Bradshaw's body] to the subscapula area," a distance of about fifteen inches; one hundred

**359**

stitches were required to join the severed skin.

Different versions of the encounters with Bradshaw were given by the accused. His testimony, like the Government's evidence, gives no indication that Bradshaw was cut by accident.

The accused maintained that in the fight outside the noncommissioned officers' club, Bradshaw struck the first blow. After this fight was stopped, he went to the dispensary to get the razor blade to have something "to scare . . . off" Bradshaw, if he came to see him at the barracks as he said he would. He went to his cubicle. He put the blade on his footlocker near his bunk, and sat down on his bunk to take off his shoes. He heard Bradshaw. He started to get up; as he did so he "picked up the razor blade" in his right hand, and held it between his "thumb and forefinger and middle finger." Before he "could balance" himself, Bradshaw seized him by his sweater and shirtfront and hit him on the face. He described what happened next as follows:

"... I tried to push him off and when I tried to push him off I cut him. I don't know why I cut him, how bad or anything like that."

Answering direct questions of his counsel, the accused explained that when he picked up the razor blade at the dispensary he intended to tell Bradshaw "he had better get away, go back and get out of . . . [his] cubicle." But when Bradshaw actually came to his cubicle he "didn't have a chance," to say anything. When hit by Bradshaw, he "wasn't thinking"; he just "tried to push him away and he was cut." On cross-examination, he said: "I admit cutting him during the fight but I don't recall intending to cut him." He further admitted he "knew" he had the razor blade in his hand when he "tried to push . . . off" Bradshaw.

The word "accident" has various meanings, according to the context of its use. Stasmas v State Industrial Commission, 80 Okla 221, 195 Pac 762, 15 ALR 576 (1921).

One meaning is that the event happened " 'without the concurrence of the will of the person by whose agency it was caused.' " State v Matheson, 130 Iowa 440, 103 NW 137, 140 (1905); State v Territory, 14 Ariz 242, 127 Pac 742. This usage of the word, for example, may be applied to the case of a person who, while walking on the sidewalk suddenly stumbles because of an unnoticed defect, falls upon and injures another. Although the injured party did not consent to the touching of his person, the act by which the injury occurred is not a punishable battery. See Lewis v Commonwealth, 140 Ky 652, 131 SW 517 (1910); Steinman v Baltimore Antiseptic Steam Laundry Co., 109 Md 62, 71 Atl 517 (1908). The word is also used to describe the situation in which a person intentionally performs an act directed against another, but does not intend the ultimate consequence of the act. For example, one may shoot a gun in the direction of another, intending merely to aim above his head and frighten him, but, instead, the bullet may lodge in the victim's heart and cause his death. To the extent that death was not the intended consequence of the act, the result may loosely be described as an "accident." See United States v Redding, 14 USCMA 242, 34 CMR 22. From the standpoint of criminal responsibility, the latter usage of the word "accident" is substantially different from the former, in that it involves at least actionable fault. In the criminal law, if the act is specifically intended and directed at another, the fact that the ultimate consequence of the act is unintended or unforeseen by the actor does not raise the defense of accident. United States v Redding, supra. The accused's version of his second encounter with Bradshaw falls into this class.

He admitted he knew he had a razor blade in his right hand; he admitted he used that hand in a calculated effort to push Bradshaw away from him. However, he denied entertaining any specific intention to cut Bradshaw, and the court-martial's findings acquitted

him of that part of the charge. Since the injury resulted from an act intentionally directed at Bradshaw, and the accused knew he held the razor blade when he carried out the act, accident of the kind that would absolve one of criminal liability "was not involved." United States v Gordon, 14 USCMA 314, 34 CMR 94. It was, therefore, proper to omit from the instructions all reference to accident as a defense. United States v Redding, supra. The assignment of error is overruled.

The decision of the board of review is affirmed.

Judges FERGUSON and KILDAY concur.