UNITED STATES, Appellee

v

LEE E. TUCKER, Private First Class,
U. S. Army, Appellant

17. USCMA 551, 38 CMR 349

No. 20,640

May 24, 1968

 

*Captain John F. Morrow* argued the cause for Appellant, Accused. With him on the brief were *Colonel Daniel T. Ghent* and *Major David J. Passamaneck*.

*Captain David K. Fromme* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel David Rarick* and *Major John F. Webb, Jr.*

## Opinion of the Court

FERGUSON, Judge:

A general court-martial convened at Fort Carson, Colorado, convicted the accused of assault with a dangerous weapon in violation of Uniform Code of Military Justice, Article 128, 10 USC § 928, and failure to obey a general regulation governing the registration of firearms, in violation of Code, supra, Article 92, 10 USC § 892. It sentenced him to bad-conduct discharge; forfeiture of all pay and allowances, and confinement at hard labor for one year. Intermediate appellate authorities affirmed. We granted accused's petition for review on the issues whether the law officer erred prejudicially in failing to instruct on the affirmative defense of accident, as pertains to the specification of Charge I; whether his instructions on the other Charge were vague and misleading; whether the law officer should have tailored the instructions presented to the defense theory that the accused was guilty of no offense if the victim seized the gun from his hand, thereby causing it to discharge; whether his deliberate use of the weapon must be established in order also to prove a violation of the regulation alleged in Charge II; and whether the law officer also erred to accused's prejudice in failing to instruct on the limited effect of evidence of misconduct not charged.

I

On Saturday, January 14, 1967, the accused accepted an invitation from a Sergeant Clark to drive downtown with him and Private First Class Johnson. He and Clark were close friends and, on a prior occasion, Clark had accompanied him to purchase a revolver so that he might have his own weapon when they went rabbit hunting. After the accused purchased the revolver, identical to one owned by the Sergeant, Clark supplied him with some ammunition.

On this occasion, however, the trip downtown was to purchase whiskey. The accused and Private First Class Johnson declared the group bought a fifth, while Sergeant Clark testified it was either a half-pint or pint. On returning, they finished consuming the beverage and parked in front of the barracks. The accused further testified that Sergeant Clark then smoked a marihuana cigarette. He was partly corroborated by Private First Class Johnson, although the incident was

552

denied by Clark and the soldier who allegedly offered it to him. In any event, Sergeant Clark stated that, after their return, he went directly to his room, thence to the first floor of the barracks, where he began to watch television. After explaining that to "[h]at up means run, move out," Sergeant Clark described the alleged assault as follows:

"Sir, I walked into the barracks, sat down and watched TV, and I was watching TV and I heard Private Tucker say, 'I ought to make both of them hat up,' and I turned around and looked to see who he was talking to, and he was looking directly at me, and I asked him who he was talking to, and he said, 'I'm talking to you,' and at that time I got up and I walked back, over in front of him, and I said, — I told him I wasn't hatting up, and he said, 'I'll make you hat up,' and I said I wasn't going anywhere, and he said, 'You are going to hat up,' and he pulled the gun out of his pocket and fired it."

Clark testified the accused then ran out the north end of the barracks and he ran out the front, suffering from an arm wound. Private First Class Johnson's testimony corroborated the "hat up" remark by the accused, and Sergeant Clark taking issue with the comment. He testified the pistol was fired while Clark was "discussing something" with the accused.

Specialist Fourth Class Woodard declared he was present when the accused said he was going to make Sergeant Clark move. He saw the accused pull a pistol and fire at Clark when they were approximately five feet apart.

Another eyewitness, Private First Class Cockrell, corroborated Clark's version of the shooting incident. He also testified that, just before the shooting the accused asked him what he knew about his, Tucker's, girl friend staying at Sergeant Clark's girl friend's house. Cockrell also stated that, after he denied any knowledge of the matter, Tucker "put his left hand in his left field jacket pocket and he pointed the revolver at me from the pocket, and he told me to go back and sit down." He heard the weapon click when the accused cocked it. Cockrell then described the assault on Clark as follows:

"He [the accused] told me to go sit where I were. Once I sit back to my position, Sergeant Clark went back and PFC Tucker says, 'Sergeant Clark,' Sergeant Clark was facing him, what was Gloria doing staying over at Ruby's house, and he said she was just staying over there, and PFC Tucker said· 'I'll make you both hat up,' and Sergeant Clark replied that he wasn't going to hat up, and PFC Tucker pulled out a pistol and he fired one shot, and Sergeant Clark went out the front door; PFC Tucker went out the back."

Various witnesses testified to accused's reputation for peaceableness. His version of the preliminary events followed the pattern already set by prosecution witnesses of being at once corroborative of, and contradictory to, testimony previously presented. However, it is the accused's description of the shooting itself which is critical to the issues. This is in sharp conflict with that given by the prosecution witnesses. The accused describes the events in the barracks, as follows:

". . . and so he came and told me later on, 'Why don't you go and get your weapon and we'll go out the back gate after chow and shoot some rabbits,' so I went and got the pistol and loaded my pistol and put it in my left-hand coat pocket, came back, I laid on my—PFC McIntosh's bunk, and some guys were getting ready to go to Vietnam, PFC Cruisner and PFC McCoy, and he asked me, he came over and was laying on my bunk and he asked me could he see the weapon. First I told him no, Sergeant Clark, then I got up off the bunk and I walked toward the footlocker, I got up on the front of the two footlocker's [sic]. He came and asked me, 'Could I see the weapon? I want to show it to PFC Cruisner and McCoy.' So I handed him the weapon, sir, and as I handed

him the weapon he snatched the weapon, like he was grabbing something, and the weapon went off."

The accused denied having pointed his weapon at Private First Class Cockrell. He testified that he neither pulled nor did he have his hand on the trigger when the weapon discharged. He testified that the pistol was loaded with a bullet in every chamber except the one beneath the hammer and that it was not cocked. He described Sergeant Clark as "a little high" and "acting kind of silly" before the shooting incident. After the weapon fired, he panicked and ran but, about two hours later, turned himself in.

Specialist Seven John W. Alden, a firearms examiner, declared he had tested the German-made revolver with which Sergeant Clark had been shot. He described the weapon as having no safety features comparable to an American-made pistol. Thus, it could be fired without pulling the trigger, simply by exerting an outside force on the hammer. This made it possible for the hammer to rotate the cylinder if the weapon was pulled from another person's tight grip; and, upon the hammer's falling, the revolver would fire without use of the trigger. A gun powder pattern test was made with the weapon, and he concluded there would be no powder marks found on a target at a distance of greater than forty inches. As no signs of gun powder were found on Sergeant Clark's field jacket, Specialist Alden concluded the weapon was fired forty inches or farther from the jacket.

## II

The defense counsel's argument made it plain the defense theory was based on the alleged accidental discharge of the weapon. The trial counsel contended that the accused's story was contradicted by all the other witnesses and that the discharge of the weapon was willful and the resultant injury purposefully inflicted. The law officer did not instruct on the defense of accident. And, although he gave a defense requested instruction relative

to the evidence that accused was of a peaceable character, he did not otherwise tailor his advice to the issues.

It is clear that if the firing of the weapon was accidental, accused was guilty of no assault. ■ United States v Redding, 14 USCMA 242, 34 CMR 22; United States v Pemberton, 16 USCMA 83, 36 CMR 239. And in United States v Condron, 17 USCMA 367, 38 CMR 165, where we held self-defense raised by the evidence, Judge Kilday stated for the Court, at page 369:

". . . Contrary to the views expressed by appellate Government counsel and by the board of review, reasonableness, *i.e.*, credibility, is a question reserved solely for the fact finders. We have consistently so held. Our most recent pronouncement on this subject is to be found in United States v Evans, 17 USCMA 238, 38 CMR 36, where, at page 242, we said:

'Thus, we have long held the test whether an offense is reasonably raised is whether the record contains some evidence to which the military jury may attach credit if it so desires. United States v Jones, 13 USCMA 635, 33 CMR 167; United States v Remele, 13 USCMA 617, 33 CMR 149; United States v Kuefler, 14 USCMA 136, 33 CMR 348. It matters not that the accused is the sole source of his contention. He certainly "has the capacity to testify directly to the intent, knowledge, or other *mens rea* which fills out and characterizes his acts either as criminal or legally blameless." United States v Remele, supra, at page 621. And the reasonable character of his testimony is "for the determination of the court-martial, under proper instructions." United States v Jones, supra, at page 640. As we said in United States v Kuefler, supra, at page 139:

"So also do trial judges and appellate bodies interfere with the function of the court mem-

bers and deprive the accused of his right to a primary trial on the facts when the credibility of his claims is found wanting in light of the strong case against him." ' "

As recently as United States v Pruitt, 17 USCMA 438, 38 CMR 236, we again applied the basic principles of law applicable here when we held that, although there was substantial evidence to discredit the accused's assertion, his unequivocal testimony was sufficient to raise a factual issue for the court-martial's consideration.

Thus, as the accused's testimony plainly raised the defense of accident, we must conclude that the law officer erred to accused's prejudice in not instructing on this defense.

The Government contends, however, that the defense of accident was not raised by the evidence, as it also showed the accused acted negligently in handling the weapon. Thus, it points to the fact accused knew the weapon was loaded; should have known of its dangerous design; pointed it at the alleged victim when he handed it to him; and did not warn the alleged victim that it was loaded. The Government cites United States v Torres-Diaz, 15 USCMA 472, 35 CMR 444, and United States v Pemberton, supra, in support of its contention that "where the circumstances indicate . . . an accused was guilty of simple negligence, he may not be found guilty of aggravated assault, but at the same time, he is not entitled to the defense of 'accident.' " Thus, in United States v Pemberton, supra, at page 84, Chief Judge Quinn stated, in part, as follows:

"Physical injury inflicted upon another with a dangerous instrumentality is not criminally punishable if it is the result of accident. United States v Redding, 14 USCMA 242, 34 CMR 22. However, accident is not synonymous with unintended injury. A particular act may be directed at another without any intention to inflict injury, but if the natural and direct consequence of the act results in injury, the wrong is not excusable because of accident. United States v Femmer, 14 USCMA 358, 34 CMR 138. Accident is an unexpected act, not the unexpected consequence of a deliberate act. See United States v Sandoval, 4 USCMA 61, 15 CMR 61."

This, however, does not support the Government's contention that an instruction on the defense of accident was unnecessary. Instead, it points out the need for the instructions to be tailored to the issues raised by the evidence. The question of accused's negligence, under the circumstances, was likewise one of fact which should have been resolved below, under proper instructions. United States v Condron, supra; United States v Kuefler, 14 USCMA 136, 33 CMR 348.

The law officer instructed the court that the accused could be found guilty of assault through culpably negligent means as well as by intentionally discharging the weapon. But, in addition to not instructing on the defense of accident, he did not tailor his advice to the issues relative to such a culpable negligent means of committing the alleged assault. He should have informed the court that, in the event it did not believe beyond a reasonable doubt that the discharge of the weapon was intentional, then it should consider whether the alleged assault was committed through culpable negligence. And, if it found the accused was culpably negligent, it then had to determine whether this negligence was the proximate cause of the weapon's discharge. Finally, he should have specifically instructed the court that, even if it found the accused culpably negligent, it could not find him guilty of having committed the alleged assault unless it also found beyond a reasonable doubt that the discharge of the weapon was not the result of the alleged intervening cause of being snatched from the accused's hand, as testified to by Tucker. In this connection, we reiterate a pertinent part of the language used by Judge Kilday in United States v Smith, 13 USCMA 471, 33 CMR 3, at page 474:

". . . The court members must be furnished with the law pertinent to the facts developed in order that they may resolve the issues before them. And, of course, an abstract statement of law may not suffice to insure intelligent determination of the questions posed.

"Lest there be room for any uncertainty in the mind of anyone, therefore, we deem it appropriate to elaborate on the sense in which this Court has used the terms 'tailor,' and 'tailoring.' What is contemplated is the affirmative submission of the respective theories, both of the Government and of the accused on trial, to the triers of fact, with lucid guideposts, to the end that they may knowledgeably apply the law to the facts as they find them."

The law officer's failure to tailor his instructions relative to the alleged assault was likewise prejudicially erroneous.

### III

The regulation which the accused was found guilty of violating provides as follows:

"5. Authorized Weapons. a. Authorized privately owned weapons which must be registered with the Provost Marshal:

. . . . .

(3) Pistols and revolvers (except fully automatic).

. . . . .

"8. Registration of Weapons. a. Every person (except law enforcement officers or visitors authorized to hunt on the reservation) who possesses, keeps, stores, or carries any weapon listed in paragraph 5a above, on the Fort Carson Reservation will register such weapon with the Provost Marshal within 48 hours after it is brought on the reservation, or prior to using the weapon in any manner, whichever should occur sooner."

The accused's undisputed testimony is that the discharge of the weapon came within 48 hours after he had brought it on post.

The Government states "[t]he regulation in question is clear on its face. By its terms one may 'possess,' 'keep,' 'store,' or 'carry,' a weapon on the Fort Carson Reservation for the 48 hour period without registering it." It argues accused did not "merely possess, keep, store, or carry the weapon," but that his own testimony shows he loaded it for the expressed purpose of going rabbit hunting and displayed it to others. The Government contends that this demonstrates the proscribed "using the weapon in any manner." The defense contends the terms "using the weapon in any manner" should have been more specifically defined and that the mere loading and production of the weapon do not constitute a use within the meaning of the regulation.

As admitted by the Government, "using the weapon in any manner" does not include the possession and asportation of the weapon. It is a cardinal principle that criminal statutes must be strictly construed, and such is applicable in construing the regulation before us. The law officer should have instructed the court that the regulation could be violated under the "using the weapon in any manner" provision only by its intentional use in the assault or by an intentional firing and tailored his instructions accordingly. As he did not instruct in this manner, we are left to speculate whether the court may have found the accused guilty of violating the regulation through merely possessing, loading, carrying, or unintentionally firing the weapon.

Of particular import in this area is the accused's testimony regarding the accidental discharge of the pistol. If believed, one could hardly find he "used" the revolver in violation of the regulation. Yet, not the slightest guidance was offered the court-martial in this area. It was left completely free to accept or reject the various versions of the incidents presented to it and apply its own concepts concerning what constituted a "use" of the pistol. Under the circumstances, we believe further instructions were clearly necessary, and the failure to deliver

them to the fact finders was plainly erroneous. United States v Smith; United States v Redding, both supra.

IV

The testimony of Cockrell that, before the alleged assault on Sergeant Clark, the accused pointed ▮ the revolver at him and told him to sit down, placed before the court evidence of uncharged misconduct. The law officer erred in failing to give instructions as to the limited purpose for which this evidence was admissible.

As reversal must follow because of the errors already discussed, it is not necessary that we assess this error for prejudice. Suffice it to say that when evidence of other misconduct not charged is received, it is the duty of the law officer, *sua sponte*, to instruct the court members concerning the limited purpose for which it is admitted. United States v Back, 13 USCMA 568, 33 CMR 100; United States v Gewin, 14 USCMA 224, 34 CMR 4; United States v Kirby, 16 USCMA 517, 37 CMR 137.

The findings of guilty and the sentence are set aside. The decision of the board of review is reversed and the record of trial is returned to the Judge Advocate General of the Army. A rehearing may be ordered.

Judge KILDAY concurs.

QUINN, Chief Judge (dissenting):

When proposed instructions were being considered, defense counsel informed the law officer that the charge and the evidence presented "an all or nothing proposition" in that the specification alleged the accused "assaulted" Clark "by shooting him" and the defense "position is that this did not occur." This was indeed a correct assessment. Either the Government witnesses, who testified that the accused deliberately shot Clark, were believed, and the accused was guilty as charged, or the accused, who testified that he merely held the gun, was believed, and acquittal was required. There were no "pitfalls . . . to en-trap" the court members into mistaken conclusions as the result of particular findings of fact. United States v Lyon, 15 USCMA 307, 312-313, 35 CMR 279. See also United States v Acfalle, 12 USCMA 465, 31 CMR 51. In my opinion, therefore, the instructions adequately covered the legal and factual issues. The law officer advised the court members that the law presumes the accused "to be innocent of the charges against him" and that to find the accused guilty of the charges they must be satisfied beyond a reasonable doubt that, "with unlawful force or violence," he "assaulted" Clark "by shooting him with a revolver." He also instructed them that the "act of violence must be unlawful, that is, without legal justification or excuse and without the lawful consent of the victim." He further called attention to the evidence of accused's peaceable character, and instructed that the law "recognizes that a person having a peaceable character is less likely to assault another than is a person having a violent character." Thus, the instructions required the court members to find beyond a reasonable doubt that the accused *actually shot* Clark; otherwise they had to "presume" him to be innocent. In my opinion, the instructions required the court members to consider the accused's version of the incident, as well as the Government's, and to acquit the accused if they entertained a reasonable doubt that he shot Clark.

As to Point III, it is, in my opinion, fanciful to suggest, as the majority do, that the court members might conclude from the instructions that an unintentional discharge of the gun would constitute a violation of the regulation's prohibition against "using the weapon in any manner." As I read the instructions, they were sufficient to explain the meaning of the regulation.

The evidence of other misconduct, which is mentioned in Point IV, was not, in my view, prejudicial to the accused. United States v Kirby, 16 USCMA 517, 37 CMR 137.

I would affirm the decision of the board of review.