648

**UNITED STATES**

v.

**Staff Sergeant Hector RODRIGUEZ, FR 464–72–2509 United States Air Force.**

**ACM 22518.**

U. S. Air Force Court of Military Review.

Sentence Adjudged 8 Feb. 1979.

Decided 16 Nov. 1979.

Appellate Counsel for the Accused: Colonel B. Ellis Phillips, Colonel Larry G. Stephens and Captain Patrick A. Tucker.

Appellate Counsel for the United States: Colonel Julius C. Ullerich, Jr., Colonel James P. Porter and Captain James R. Van Orsdol.

Before EARLY, POWELL and ARROWOOD, Appellate Military Judges.

## DECISION

ARROWOOD, Judge:

It is charged that the accused did by culpable negligence unlawfully kill his wife by shooting her in the head with a .25 caliber automatic pistol, in violation of Article 119, Uniform Code of Military Justice, 10 U.S.C. § 919. The military judge was requested to give an instruction on the defense of accident, but he decided the issue had not been reasonably raised by the evidence and refused the instruction. Appellate defense counsel now assert that he erred in that decision. They also contend that evidence of accused's intoxication and his testimony that he "did not remember" the advisement of his Article 31, 10 U.S.C. § 831 rights required the issue of the voluntariness of the statements be submitted to the court members. The military judge ruled otherwise. He also ruled that the security police properly entered the accused's quarters to assist in the emergency occasioned by the shooting. This decision is also challenged by appellate defense counsel. In each situation we find the military judge to be correct in his rulings.

According to his testimony, the accused, prior to the shooting had decided to leave his base quarters and look for his brother who he believed was at a local bar. He told his wife to get his pistol as he intended to take it with him. The wife gave him the pistol, but asked that he reconsider going out. The accused then said that he better not go because if someone messes with them he "would do this". At that time he raised his hand in the air, checked to see if there was a clip in the gun and "lowered

my hand toward her." [1] At that time the gun fired, and the wife grabbed her head. She died several days later at the hospital.

The accused did not remember pulling the trigger, although in his demonstration at trial, he had his finger inside the trigger guard when lowering the pistol. He estimated that he was standing approximately five and one-half feet from her when the pistol fired. Expert testimony based on the speckling of powder burns on the skin around the wound showed that the pistol could not have been fired more than nine inches from her head.

The accused testified that he "didn't know much about a weapon like that". At one time he had even attempted to fire the pistol, but did not know how to cock it. A week before the incident, while in Houston, Texas, he saw a friend pull back the slide to cock the pistol. Later, while driving in downtown Houston, he placed the clip in the pistol and pulled back the slide to cock it. Upon returning home, he removed the clip from the pistol and put it away. He did not remove the bullet from the chamber or release the hammer. The next time he had the pistol was when his wife handed it to him on the night she was shot. At that time he did not check the weapon to determine whether there was a bullet in the chamber, if it was cocked, or if the safety was on.

■ Paragraph 216*b,* Manual for Courts-Martial, 1969 (Rev.), provides that "[a] death . . . which occurs as the result of an accident or misadventure in doing a lawful act in a lawful manner is excusable." Accident is an unexpected act not due to negligence. *United States v. Sandoval,* 4 U.S.C.M.A. 61, 15 C.M.R. 61 (1954). It is not the unexpected consequence of a deliberate act. *United States v. Pemberton,* 16 U.S.C.M.A. 83, 36 C.M.R. 239 (1966). To be excusable as an accident, the act must have been the result of doing a lawful act in a lawful manner, free of negligence. *United States v. Sandoval, supra;*

*United States v. Redding,* 14 U.S.C.M.A. 242, 34 C.M.R. 22 (1963); *United States v. Moyler,* 47 C.M.R. 82 (A.C.M.R.1973); *United States v. Crosley,* 25 C.M.R. 498 (A.B.R. 1957). If the evidence in a case is such that the defense of accident is raised, the defense is entitled to an instruction on that theory of the case. *United States v. Tucker,* 17 U.S.C.M.A. 551, 38 C.M.R. 349 (1968); *United States v. Sandoval, supra.*

■ Government counsel contend that the defense of accident was not raised by the evidence, as the accused's testimony shows that he acted negligently in handling the weapon. If the defense was not raised, as contended by the Government, there would be no requirement for the military judge to give the requested instruction to the court. *United States v. Sandoval, supra.* There were no witnesses to the incident, so the Government's case was based primarily on the evidence found at the scene and the out-of-court statements of the accused. The only testimony as to how the shooting occurred was from the accused. Of course, his testimony alone could be sufficient to raise the accident defense, *United States v. Pruitt,* 17 U.S.C.M.A. 438, 38 C.M.R. 326 (1968), if his description of his conduct was such as to depict a shooting which occurred as a result of doing a lawful act in a lawful manner, free of negligence. That was not the result in this case. He pictured himself as failing to exercise due care for the life of his wife by handling the pistol without knowing how to operate it, failing to determine if it was loaded, cocked, or whether the safety was in place, and then raising it over his head and lowering it in the direction of his wife. We find that this conduct, admitted by the accused in his testimony, clearly constitutes negligence. *United States v. Sandoval* and *United States v. Moyler,* both supra. Therefore, as there was no evidence from which the accused could be found to have acted without negligence, the defense of accident was not raised and we find no

---

1. The quote is from the accused's hand written statement which he testified accurately reflected what happened.

error in the refusal of the military judge to instruct thereon.

■ Appellate defense counsel also contend that the military judge erred when he refused to submit to the court-martial, under proper instructions, the issue of the voluntariness of pretrial statements of the accused. The issue was litigated before the military judge at an Article 39(a), 10 U.S.C. § 839(a) session and resolved adversely to the accused. At that time trial defense counsel stated that he did not intend to raise the issue before the court members. However, as the trial progressed, the accused testified before the members that he "did not remember" whether he had been properly advised of his rights before he made the statements. He did remember parts of his rights being read on several occasions and on one occasion he was given a copy of his rights which he initialed. Trial counsel offered evidence, as he did at the Article 39(a) session, that the accused had been fully advised of his rights. Then trial defense counsel requested that the issue be presented to the court members on proper instructions, but the military judge ruled the accused's testimony did not raise the issue. We believe this testimony demonstrates the absence of evidence to raise an issue as to the adequacy of the advice given the accused in regard to his rights and his understanding of them. Further, it is clear beyond all doubt from the accused's testimony that he freely and voluntarily elected to speak and make a written statement rather than remain silent. *United States v. Sikorski,* 21 U.S.C.M.A. 345, 45 C.M.R. 119 (1972).

■ It was also contended that the evidence presented to the court members as to the accused's intoxication raised the issue of voluntariness of the statement made at Fort Sam Houston shortly after the shooting. The court members heard from the accused that he may have drunk as many as five beers earlier in the evening and a bourbon and water around eight o'clock that night, but he denied that he "felt drunk" or "felt high" at the time of the incident. The ambulance driver who aided the accused's

wife testified there was a strong odor of liquor about the accused, his eyes were bloodshot and his face was flushed. He also stated the accused used the ambulance litter to brace himself several times while he assisted in carrying his wife from the house. During the hour between the observations of the driver and the interview, the accused had returned to his quarters at the request of the driver and retrieved a medical bag, drove his car at a high rate of speed, following the ambulance, from Randolph Air Force Base to Fort Sam Houston, and had asked a friend who he met at the hospital to keep the clip which he had previously removed from the pistol. There is no evidence in the record that even suggests the accused was intoxicated during the interview that followed or that his previous use of alcohol had any relationship to his decision to discuss the incident with the investigators. Accordingly, we find no evidence of intoxication sufficient to raise the issue of voluntariness of the statement requiring instructions by the military judge. *United States v. Sikorski,* supra. See also *United States v. Graves,* 1 M.J. 50 (C.M.A.1975).

The evidence found in the area of the quarters where the shooting occurred was objected to by trial defense counsel as the fruits of an illegal search. After a full hearing on the search at an Article 39(a) session the military judge ruled the evidence was admissible. Appellate defense counsel now contends that the military judge erred when he admitted these exhibits.

The evidence necessary to resolve this issue shows that immediately after the accused realized that his wife had been shot, he called the base operator and requested assistance. The ambulance attendants who responded knew they "had a gunshot wound" at the given address. They had difficulty finding the location and were subsequently hailed by the accused who raced in front of the ambulance some one hundred yards to his quarters. They then followed the accused through the rear door of his quarters and into the dining area where the wife lay in a corner. The attend-

ants applied a bandage to her head and carried her to the ambulance. She was taken to the hospital at Fort Sam Houston. The accused followed in his car.

The security police who responded to the call were notified that there had been a shooting, someone was wounded at the address and that the ambulance had already been notified. When they reached the quarters they saw the ambulance leaving the area, but had no verbal contact with the attendants or the accused. Approaching the quarters, they found the door unlocked and the first floor lit. They "cautiously" entered, looking for "anyone or anything that had to do with the shooting". As one security police testified, "I wanted—my checking the house—for my own—just so I'd be sure, you know. Everyone's not perfect, and, who knows—they might have left someone, and I wanted to make sure." They immediately saw the blood on the floor and the pistol on the table. Quickly checking the lower level and finding no activity, one of them proceeded up the stairs. He discovered two children asleep in bed. As he flicked on the light they "aroused a little bit." Seeing no apparent injury to them he turned off the light and left them asleep. He returned to the lower level where he assisted in securing the area until the Air Force Office of Special Investigation (OSI) agents arrived. When the OSI agents came they were briefed by the security police and began a routine crime scene investigation. The evidence objected to at trial by defense counsel was then removed from the dining room area by the OSI.[2]

 It is clear that police "may enter a dwelling without a warrant to render emergency aid and assistance to a person they reasonably believe to be in distress and in need of that assistance." *Root v. Gauper,* 438 F.2d 361 (8th Cir. 1971). See *United States v. Smeal,* 23 U.S.C.M.A. 347, 49 C.M.R. 751 (1975).[3] In applying the emergency doctrine the question that must be answered is whether there is "evidence which would lead a prudent and reasonable official to see a need to act." *Wayne v. United States,* 115 U.S.App.D.C. 234, 318 F.2d 205 (D.C.Cir.1963). The fact that someone had been shot, wounded or even killed would provide such an emergency. *People v. Neulist,* 43 App.Div.2d 150, 350 N.Y.S.2d 178 (1973); *Patrick v. State,* 227 A.2d 486 (Del.1967); *United States v. Smeal,* supra.[4] When officers are properly on the scene in response to such an emergency they are not required to close their eyes to items which are in plain view, and where the injured party who has a right of possession or control over the premises appears to be the victim of an assault, they should investigate it as a crime against that person. *United States v. Smeal* and *People v. Neulist,* both supra; *United States v. Barone,* 330 F.2d 543 (2d Cir. 1964), cert. denied, 377 U.S. 1004, 84 S.Ct. 1940, 12 L.Ed.2d 1053 (1964).

Appellate defense counsel do not contest the fact that conditions for an emergency entry existed while the victim was in the home, however, they contend the emergency terminated when the ambulance attendants took the victim to the hospital. Therefore, the police were not responding to an emergency situation when they entered the accused's quarters.

 When the security police arrived at the accused's quarters they saw an ambulance leaving the area. They did not know whether the victim was in the ambu-

---

2. Although the base commander arrived at the scene shortly after the OSI and was briefed by them, he was never asked for permission to search the quarters nor do we believe his order to "carry on" can be interpreted as authority to conduct a search.

3. For a discussion of emergency assistance by police see LaFave, *Search and Seizure,* sec. 6.6 (1978).

4. *Mincey v. Arizona,* 435 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), declined to recognize any special authority in the police to conduct a warrantless investigation at the scene of a possible homicide, but noted that no "emergency threatening life or limb" had been established by the facts in the record. For a discussion of the implications of *Mincey,* see LaFave, supra, sec. 6.5(e).

lance for there was no contact with the ambulance attendants or anyone at the scene to relay information. This sighting was properly viewed by the security police as a non-conclusive fact, insufficient to end the emergency to which they had been summoned. See *United States v. Barone,* supra. Therefore, it was reasonable for them to enter the quarters to render assistance; indeed, had they not entered the quarters they might well have been derelict in their duty. See *State v. Helzkon,* 283 So.2d 49 (Fla.App.1973). Since they were properly on the scene to investigate an injury to the wife who has a right to possession and control over the quarters, the security police would not have to remove themselves from the scene when it was determined that the emergency no longer existed. *United States v. Smeal,* supra. For when they observed circumstances that indicated the wife may have been the victim of a crime, they were duty bound to investigate the circumstances in her behalf. *United States v. Neulist* and *United States v. Barone,* both supra. The action taken by the OSI upon arrival at the scene was an extension or continuation of the investigation of that crime since there had been a continuous and legally proper police presence on the scene. *United States v. Neulist,* supra.

Accordingly, we find the search of the accused's quarters to be lawful. The military judge did not err in admitting the fruits of the search into evidence.

The remaining assignments of error made by both appellate and trial defense counsel are without merit. Accordingly, the findings of guilty and the sentence are

AFFIRMED.

EARLY, Chief Judge, and POWELL, Judge, concur.