**UNITED STATES**

v.

Samuel J. MONS, 132 48 9484, Seaman Apprentice (E–2), U. S. Navy.

NMCM 81 2018.

U. S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 25 March 1981.

Decided 27 July 1982.

Samuel C. Stretton, Esq., Individual Defense Counsel.

LCDR W. P. Caruthers, JAGC, USN, Appellate Defense Counsel.

MAJ Charles Wm. Dorman, USMC, Appellate Government Counsel.

Before CEDARBURG, C. J., and GORMLEY and MAY, JJ.

CEDARBURG, Chief Judge:

Appellant was convicted, contrary to his pleas, by a general court-martial composed of officer members. The charges were unpremeditated murder, murder while perpetrating a robbery, robbery, and violation of U. S. Navy Regulations by introducing marijuana aboard the U. S. Naval Base, Philadelphia, Pennsylvania, violations of Articles 118, 122 and 92, Uniform Code of Military

Justice (UCMJ), 10 U.S.C. §§ 918, 922, 892. He was sentenced to a dishonorable discharge, confinement at hard labor for life, forfeiture of all pay and allowances and reduction to pay grade E–1. The convening authority approved the sentence as imposed.

Appellant was represented at trial by appointed defense counsel, Lieutenant Michael K. Mixon, and individual military counsel, Lieutenant Commander Lawrence J. Rosintoski, both certified as counsel in accordance with Article 27(b), UCMJ, 10 U.S.C. § 827(b). Appellant has retained a civilian attorney, Samuel C. Stretton, Esquire, along with appointed appellate defense counsel, to represent him on appeal.

Appellant assigns as error:

I

THE CONVICTION OF THE APPELLANT SHOULD BE REVERSED AND A NEW TRIAL GRANTED SINCE HE DID NOT RECEIVE EFFECTIVE ASSISTANCE OF COUNSEL DURING HIS TRIAL.

II

THE COURT ERRED WHEN IT DENIED THE DEFENSE'S MOTION TO SUPPRESS ALL EVIDENCE RELATED TO THE ENTRY AND SEARCH OF THE BARRACKS ROOM AND SUBSEQUENT SEARCH OF THE APPELLANT'S CLOTHING.

III

THE COURT ERRED IN NOT SENTENCING MR. MONS UNDER THE FEDERAL YOUTH CORRECTIONS ACT.

We determine that appellant received adequate representation, that the trial judge did not err when he denied the defense motion to suppress all evidence related to the entry and search of Room B–101, and that the Federal Youth Corrections Act is inapplicable to the Uniform Code of Military Justice proceedings. We therefore affirm.

On 13 December 1980 the duty manager of Barracks 972, U. S. Naval Base, Philadelphia, Pennsylvania, accompanied by a master-at-arms and residents of the barracks, used his master key to open Room B–101 in response to a report from one of the barracks residents of shuffling noises and an emotional cry for help emanating from the room. Appellant was lying on the floor, apparently unconscious and apparently experiencing a seizure. Blood was scattered over a wide area and the room was in disarray. A knife was lying on a desk in a closed position. A base master-at-arms, also summoned to the scene, opened a locker and Seaman Apprentice James E. Johnson, Jr. was discovered, barely alive, stuffed head down in a large Navy issue laundry bag. Seaman Apprentice Johnson, suffering multiple stab wounds to the head, chest, back and arms, and a blow to the head inflicted by a blunt instrument, died shortly thereafter.

I

Appellant complains that he did not receive effective assistance of counsel during his trial, which, he asserts, requires reversal of his conviction. At issue, principally, is the defense handling of the rebuttal testimony of Lieutenant Commander Tommy Swinney, MC, USNR, called by the prosecution after the defense case-in-chief. The defense team did not present testimony of a medical doctor to refute the rebuttal testimony of Dr. Swinney concerning his opinion that there was no clinical evidence that appellant was under the influence of LSD or suffering from an LSD induced trauma at the time he was admitted to the Navy Regional Medical Center, Philadelphia, on 13 December 1980. Appellant contends "... Dr. Swinney's testimony was devastating to the defense since essentially Dr. Swinney was stating Samuel Mons was not telling the truth when he said he took a drug and then went into a drug related coma". It is contended, citing *United States v. Rivas*, 3 M.J. 282 (C.M.A.1977), that the decision of the defense team not to call a medical doctor to attempt to repudi-

ate Dr. Swinney's testimony constituted inaction at a critical stage of the trial where action was compelled, and resulted in inadequate representation. Appellant also contends in support of his allegation of inadequate representation that defense counsel were ineffective in failing to object to the expertise of Dr. Swinney and his professional opinion, and the failure to cross-examine him in a proper fashion. Finally, appellant argues that the defense counsel was ineffective by asking appellant, during direct examination, about an inculpatory statement which previously had been suppressed. Appellant testified in his defense that he had ingested LSD on the night in question and recalled very little which occurred after his arrival at Room B–101, and did not recall any events connected with any criminal conduct in the room.

Dr. Swinney was called as a rebuttal witness by the Government. He testified that he was a resident physician at the Navy Regional Medical Center, Philadelphia on 13 December 1980. His duties on that evening included being on call for treatment of internal medicine cases. He was called upon to examine and assess the function of appellant who had been admitted to the emergency room and was reported to be unresponsive. He examined appellant to check his vital signs and to see if he was in a state of coma. Dr. Swinney was of the opinion that appellant's vital signs were stable and that he was not suffering from an LSD induced trauma or any state of trauma. He testified he found no clinical evidence to indicate appellant had been under the influence of LSD.

On cross-examination, Lieutenant Commander Rosintoski elicited Dr. Swinney's limited experience with LSD patients and specifically those who had experienced adverse reactions—"bad trips". He obtained an admission from the doctor that factors such as increased vital signs, visual and auditory hallucinations and euphoria which he had used to describe symptoms of LSD intoxication, and which the doctor had not observed in appellant, were associated with "good trips", not "bad trips". Dr. Swinney conceded that persons on "bad trips" some-

times get psychotic, exhibit violent behavior and have to be restrained. He admitted that usually a psychiatric examination is not made until the persons are stable. Dr. Swinney, in response to questions asked on cross-examination, did not preclude the possibility that appellant had ingested some drug, but he stated he didn't believe appellant had taken LSD. He confirmed that the diagnosis he had made and which was recorded in the narrative summary signed by him was "suspected drug ingestion". Dr. Swinney further conceded on cross-examination that in the narrative summary he had recorded that "[t]he pulses were adequate, however, somewhat disorientated." Dr. Swinney, upon being questioned, defined "disorientated" as meaning that a person in that condition is not aware of time, place or person. Questioned further he explained, "[i]f he's not of all three then the person is not too orientated." From the record, it is clear that Lieutenant Commander Rosintoski had previously interviewed Dr. Swinney, and utilized his interview and the clinical record in preparation for his cross-examination.

Beyond the cross-examination, the defense submitted surrebuttal to Dr. Swinney's testimony through two nurses, Lieutenant Julie Wagen, NC, USNR, and Lieutenant Brenda Payne, NC, USN, both of whom had treated appellant after his admission to the emergency room at about 2130, 13 December. Testimony was elicited from Lieutenant Wagen, who was on duty and observed appellant on a fairly continuous contact from his admission until 0700 the next morning, that at times appellant seemed unaware of his surroundings, was combative and pulled at his restraints, and displayed real terror in his eyes. Lieutenant Payne testified that she was the recorder in appellant's case from 2015 until about 2100. (In fact her nursing notes record her assumption of duties of recorder as 2045 until 2130.) She was of the opinion that the appellant had a limited understanding of what was going on. Lieutenant Payne testified she had two years experience as a psychiatric nurse, having treated over a

hundred drug overdose cases. During the forty-five minutes that she cared for appellant, she testified he appeared to be confused, was not able to give his name, did not know where he was, or the date, time or day of the week. He had trouble responding to questions and there was a possibility he may have been hallucinating.

The U. S. Court of Military Appeals has had occasion only recently to discuss effective assistance of counsel in *United States v. Jefferson*, 13 M.J. 1 (C.M.A.1982). Therein they stated:

We have interpreted the military accused's right to representation by counsel, as guaranteed by Article 27(a), UCMJ, 10 U.S.C. § 827(a), to entail the right to "the *effective* assistance of counsel" *United States v. Rivas*, 3 M.J. 282, 287 (C.M.A. 1977); *United States v. Walker*, 21 U.S.C. M.A. 376, 378, 45 C.M.R. 150, 152 (1972). In addition, an accused is entitled to a reasonably competent counsel who exercises that competence in his client's behalf throughout the trial. *United States v. Rivas, supra; United States v. DiGiulio*, 7 M.J. 848, 856 (A.C.M.R.1979), *pet. denied* 8 M.J. 167 (A.C.M.R. [sic] 1979). *See United States v. Walker, supra; United States v. Gaillard*, 49 C.M.R. 471 (A.C.M.R.1974). The precedents of this Court clearly adopt the standard utilized by most of the federal courts. Like those of many federal courts, however, the precedents of the military courts do not specifically define or delineate what are the skills and knowledge demanded of a competent counsel.

*Id.* at 5. In addition, they cited with approval the holding of United States Court of Appeals for the District of Columbia in *United States v. DeCoster*, 624 F.2d 196 (D.C.Cir.1979). That court held that ". . . before an accused could prevail on the issue of ineffectiveness of counsel he had to demonstrate: (1) 'serious incompetency' on the part of his attorney; and (2) that such inadequacy affected the trial result." *Jefferson, supra* at 5.

■ We "will not second-guess the strategic or tactical decisions made at trial by defense counsel. . . ." *United States v. Rivas*, 3 M.J. 282, 289 (C.M.A.1977). The reason for this long-standing and generally accepted rule of appellate review is well stated in *United States v. Cohen*, 2 M.J. 350 (A.F.C.M.R.1976), *pet. denied*, 3 M.J. 88 (C.M.A.1977), quoting Judge Latimer in *United States v. Hunter*, 2 U.S.C.M.A. 37, 6 C.M.R. 37 (1952).

It must be remembered that appellate counsel and this Court have the advantage of viewing the record after the findings and verdict and when the decisions made in the conduct of the trial may be distorted by our lack of knowledge possessed by the trial [defense] counsel.

■ With the above guidance in mind, we find no lack of effective assistance disclosed by the record of the defense team's handling of the rebuttal testimony of Dr. Swinney. Neither do we conclude that the other asserted failings of the defense team rise to the level of inadequate representation nor do they demonstrate serious incompetency which affected the trial result.

The rebuttal and surrebuttal witnesses all had one thing in common. They were present and observed and treated appellant at the critical time of his admission shortly after his discovery in Room B–101. They testified from first-hand knowledge and observation. We cannot say that the cross-examination of Dr. Swinney by Lieutenant Commander Rosintoski was not as effective as could be expected of a counsel of reasonable competence. He had previously interviewed the doctor and was familiar with his narrative summary of the clinical record. He extracted admissions and concessions which emphasized the defense contention of drug ingestion and, specifically, LSD use. Dr. Swinney's limited expertise in treatment of drug overdose patients and particularly those with adverse reactions to LSD was elicited. The surrebuttal testimony of the two nurses, one of whom had extensive psychiatric experience with drug overdose patients, provided supportive evidence of drug intoxication by professional medical personnel who were personally and closely in attendance to appellant. Appellant's

own testimony, the testimony of numerous lay witnesses and the expert medical testimony of Lieutenants Wagen and Payne, coupled with the cross-examination of Dr. Swinney, adequately presented appellant's contention that he was under the influence of drugs at the time of the charged offenses.

We find no merit to appellant's contention, in retrospect, that the defense counsel were ineffective by the failure to object to the expertise of Dr. Swinney. Dr. Swinney was a medical doctor who had been the initial treating physician and whose basic credentials had been established by the trial counsel. We do not know what trial defense counsel may have known of Dr. Swinney's credentials. We do know that it is a well recognized and frequently used trial tactic to stipulate to a known degree of expertise. Moreover, defense counsel did bring out on cross-examination the doctor's limited experience and expertise in cases involving drug overdoses, and, more particularly, "bad trips" associated with LSD ingestion.

We likewise reject appellant's assertion of inadequate representation predicated upon elicitation by defense counsel from appellant that he had made a statement to a Naval Investigative Service (NIS) agent different from the version he was testifying to at trial. The statement in question had been suppressed. Significantly, the substance of the statement never came before the court members. What was heard by them, over the strenuous and repeated objection of the trial counsel, was that appellant, when interrogated as a suspect shortly after the events of 13 December, had maintained to the NIS agent that he had only a limited recollection of events for a short time after his return to the barracks and no recollection of any criminal conduct. He then testified that only after suggestions by the agent as to how the events might have occurred did he agree with some of the agent's analysis. When the questioning was objected to by the trial counsel, appellant's counsel revealed his purpose was to show that the central thrust of appellant's testimony, that he could not remember, was

not a recent fabrication. At the very least, the testimony serves to bolster appellant's contention that he did not remember any participation in criminal acts, nor had he in the past, although agreeing with the hypothetical analysis of an investigator as to how the criminal acts may have happened.

In summary, the record supports that the defense team functioned with the customary skill and knowledge which normally prevails within the range of competence demanded of attorneys in criminal cases, *United States v. Rivas, supra,* and no serious incompetency by the trial team that affected the trial result, *United States v. Jefferson, supra,* has been demonstrated.

## II

Appellant makes three contentions in his second assignment of error. He asserts the initial entry into Room B–101 was illegal and all derivative evidence was thereby tainted and inadmissible; the search of the closed locker containing the deceased was illegal even if the initial entry is found to be legal; and the evidence obtained from appellant's clothes after they were removed from him at the time of his admission to the Navy Regional Medical Center was the result of an illegal search. We reject each of his contentions and find the military judge did not err in admitting the contested evidence.

The murder of Seaman Apprentice Johnson allegedly took place in Room B–101 in Barracks 972 aboard the U. S. Naval Base, Philadelphia. At trial the appellant moved to suppress all evidence seized as a result of a warrantless entry into the room. On the evening of 13 December 1980, Fireman Pedro Espinosa walked by Room B–101 and heard shuffling noises and banging against the walls. He stood there for awhile listening and was departing when somebody inside the room said "Somebody please help me". Espinosa testified "It sounded like . . . the first one was a lot of pain, you know 'Somebody help me', very emotional." Espinosa then called out, "Somebody please open the door". At that point he left to get

the barracks manager, Mess Management Specialist Alfredo Forelo. He told Forelo that something was going on in the room; someone needed help. Forelo accompanied Espinosa back to the room and knocked on the door. Someone inside the room asked "What do you want?" Bumping and hitting noises were heard by Forelo. Boatswain's Mate Third Class Brian Jackson, separately tried by general court-martial for his alleged involvement, the person to whom the room was officially assigned and who was a master-at-arms, was called over. Forelo asked him if he knew what was going on and to open the door. Jackson shrugged, gave no answers and did not open the door. Forelo, who believed, incorrectly as it turned out, that he was not authorized under barracks regulations to enter a room without a master-at-arms, then called the base master-at-arms. Master-at-Arms First Class Roger T. Wells arrived 7 to 10 minutes later. Forelo opened the door and appellant was found, apparently unconscious, unable to talk and having a seizure.

Upon discovery, appellant was gagging, throwing up, and kicking around and thrashing. Aviation Boatswain's Mate (Aircraft Handling) First Class (ABH1) George B. Antone heard the call to investigate an incident at Barracks 972. He and his partner responded to the call with a first aid kit. When he arrived at the room he observed appellant apparently having a seizure or fit. After rendering some initial aid to prevent appellant from swallowing his tongue, he checked to see if an ambulance had been called and then ran into the street, waved down the ambulance and returned to the room with the corpsman. The corpsman asked if anyone knew what was wrong. Antone, who had prior training as an ambulance technician, then started looking around for drugs or liquor or something to cause the convulsions. He saw a paper sack with bloody gloves in it and a large bag of what appeared to be marijuana on the floor. He noticed a lot of blood near the window and checked the window, but it was not broken. He opened a closed locker with no name on it and discovered Seaman Apprentice Johnson stuffed in a laundry bag with only his feet sticking out. He screamed for the corpsman.

Master-at-Arms First Class (MA1) Thomas Bissonette was dispatched to Barracks 972 and thereafter accompanied the ambulance crew which took appellant to the hospital. Appellant's clothing was cut from his body in the emergency room in his presence. When appellant was taken to the Intensive Care Unit, he took possession of the clothing and transported it to the Shore Patrol Office, and held it until a special agent of the Naval Investigative Service arrived and took him to Barracks 972 where he turned the clothing over to a patrolman from the Philadelphia Police Crime Laboratory. The patrolman would accept the clothing only after it was inventoried and all valuables removed. He wanted only the clothing. Bissonette removed items from the clothing which were subsequently identified and admitted in evidence.

The military judge made special findings: At this time I propose to announce the special findings as requested by the defense. I do not propose to make any special findings with regard to the special findings the deal—the request for special findings that deal with matters that were resolved in favor of the defense which would include the standing issue. Regarding the warrantless entry into B–101 and subsequent searches, the initial entry into the room was legal as it was done in a good faith effort to prevent immediate or ongoing personal injury to an occupant within the room falling within the Military Rule of Evidence 314(i). The fact that Fireman Espinosa heard scuffling like noises, banging against the wall and a painful "Help me. Someone please help me. Open the door", led him to believe that someone inside the room needed help. Immediately he ran down to get the barracks manager, Petty Officer Forelo, who followed him to the room, all of this taking about 15 seconds. After being advised of some disturbance in the room and being told that something was going on and someone needed help he could have and probably should have

opened the door at that point. But due to a fear of personal injury to himself and additionally having heard more bumping sounds and the query upon knocking "What do you want?"—because of his fear of personal injury to himself he called the MA force for assistance after Petty Officer Jackson failed to assist him on request. The lapse of several minutes awaiting the MA force arrival under the circumstances did not alter the basis for entering the room. Additionally, although not significantly material to the resolution of that particular issue, Petty Officer Wells did state that someone indicated that someone in the room was in trouble. However, even in the absence of that since the basis of entering the room existed prior to the MA's arrival, their arrival added nothing. The subsequent search of the open areas as well as the lockers by Petty Officer Antone is permitted under Rule 314(i) since I find that the purpose was to obtain information that would assist in the rendering of aid to the accused and the emergency circumstances that existed to save his life by determining the cause of his apparent physical stress.

With regard to the warrantless seizure of the clothing allegedly belonging to the accused by Petty Officer Bissonette at the hospital, under Rule 316(d)(4)(C) the items of clothing were in plain view and Petty Officer Bissonette had probable cause to believe the clothing was evidence concerning the incident which resulted in the accused being in the hospital, reasonably concluding that some crime had been committed and the clothes would be evidence since they had blood on them even though the accused was not a suspect and not under apprehension at the time.

With regard to the subsequent warrantless search of the clothing that had been seized, this was legal as a routine administrative inventory of personal belongings under Rule 313(c). Agent Tuttle was in the process of turning over the clothing then in a clear plastic bag to Mr. Labrice of the Philadelphia Police Department in order to have the same ana-lyzed when he was told the clothing could not be accepted money being seen hanging out of the pocket. So a routine administrative inventory was conducted and the fruit of that inventory would be legally admissible evidence in these proceedings.

We conclude that the military judge was justified in his special findings and in his admission of the evidence sought to be suppressed.

■ We observe that the standing issue was properly resolved in favor of appellant by the military judge and need not be discussed herein. On the basis of the evidence presented on the motion to suppress, we are satisfied that the initial entry into Room B–101 was fully justified, as found by the military judge, by Rule 314(i), Military Rules of Evidence. This was not an entry effected to conduct a prosecutorial search. *See United States v. Lewis*, 11 M.J. 188 (C.M.A.1981) (search was not a search for evidence of crime, but to locate person). It clearly was a ". . . good faith effort to render immediate medical aid, to obtain information that will assist in the rendering of such aid, or to prevent immediate or ongoing personal injury". Mil.R.Evid. 314(i). The justification for entry was not diminished by the delay following the initial pleas for help emanating from the room which resulted from an understandable confusion as to what was legally permissible, given the state of conventional lay wisdom regarding such a complex subject. In a case decided by the Air Force Court of Military Review before the effective date of the Military Rules of Evidence, but applicable to the present emergency entry situation, it was stated:

It is clear that police "may enter a dwelling without a warrant to render emergency aid and assistance to a person they reasonably believe to be in distress and in need of assistance." *Root v. Gauper*, 438 F.2d 361 (8th Cir. 1971). *See United States v. Smeal*, 23 U.S.C.M.A. 347, 49 C.M.R. 751 (1975) In applying the emergency doctrine the question that must be answered is whether there is "evidence

which would lead a prudent and reasonable official to a see a need to act." *Wayne v. United States*, 115 U.S.App. D.C. 234, 318 F.2d 205 (D.C.Cir.1963). *United States v. Rodriguez*, 8 M.J. 648, 652 (A.F.C.M.R.1979).

Once in the room and discovering the apparent distress of appellant from unknown causes, the efforts of ABH1 Antone were not in the nature of a prosecutorial search, but rather were directed at discovering information which would assist in rendering aid to appellant whose medical condition was the primary focus prior to the discovery of Seaman Apprentice Johnson by Antone. Mil.R.Evid. 314(i).

■ Finally, in the case before us, appellant's clothes had been cut from his body for medical purposes by medical personnel. They were the product of no unlawful search. They did, however, constitute evidence of crime under Rule 316(b), Military Rules of Evidence, which justified their seizure by MA1 Bissonette. The subsequent inventory of the clothes to secure valuables was reasonable and authorized under Rule 313(c), Military Rules of Evidence.

The military judge correctly denied the motion to suppress.

### III

■ We summarily reject appellant's final assertion of error. The Federal Youth Corrections Act is manifestly inapplicable to proceedings under the Uniform Code of Military Justice for the reasons expressed in *United States v. West*, 7 M.J. 570 (A.C.M.R. 1979), *pet. denied*, 8 M.J. 24 (C.M.A.1979).

· Accordingly, the findings and sentence as approved on review below are affirmed.

Judge GORMLEY and Judge MAY concur.