UNITED STATES, Appellee

v.

**William H. WRIGHT, Private First Class
U.S. Marine Corps, Appellant.**

No. 93–1482.
CMR No. 90 2544.

U.S. Court of Appeals for
the Armed Forces.

Argued Nov. 10, 1994.

Decided June 12, 1995.

———

For Appellant: *Major Hagen W. Frank,*
USMC (argued).

1. *See* 41 MJ 213, 229 n. * (1994).

2. We also granted review of the issue (39 MJ 378) resolved in favor of the Government in

For Appellee: *Lieutenant D.K. Herlihy,*
JAGC, USNR (argued); *Colonel T.G. Hess,*
USMC and *Commander S.A. Stallings,*
JAGC, USN (on brief); *Lieutenant E. Enriques,* JAGC, USNR.

*Opinion of the Court*

WISS, Judge:

1. In a contested trial, a general court-martial composed of a military judge alone convicted appellant of a single specification of conspiracy to commit premeditated murder and larceny (he was acquitted of language that included desertion within the conspiracy), in violation of Article 81, Uniform Code of Military Justice, 10 USC § 881. The judge sentenced appellant to a dishonorable discharge, confinement for 25 years, total forfeitures, and reduction to the lowest enlisted grade. The convening authority suspended confinement exceeding 6 years for the period actually served and otherwise approved these results. The Court of Military Review [1] affirmed in an unpublished opinion, one judge vigorously dissenting.

2. In turn, we granted appellant's petition for review (39 MJ 378) in order to consider the state of the evidence that appellant had entertained the specific intent required of conspiracy to commit premeditated murder.[2] Particularly, our inquiry focuses on a search for evidence that appellant joined in an agreement to kill, as opposed to having a more passive state of mind.

3. The majority opinion below did not particularly address this issue, but a lengthy dissenting opinion by Judge Freyer (unpub. op. at 2–6) concluded with an expression of reasonable doubt as to whether appellant *or* his alleged co-conspirator had intended to murder. Restricted as this Court is, however, to questions of law, not fact, *compare* Art. 66(c), UCMJ, 10 USC § 866(c), *with* Art.

*United States v. Mitchell,* 39 MJ 131(CMA), *cert. denied,* —— U.S. ——, 115 S.Ct. 200, 130 L.Ed.2d 131 (1994).

67(c), UCMJ, 10 USC § 867(c) (1989), we conclude that the evidence is legally sufficient, so we affirm. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

## I

4. The prosecution's principal witness was a former Marine named Hohnwald. A few days after Hohnwald was administratively discharged on June 22, 1989, a Marine named Trahan told him that his roommates, appellant and another Marine named Cooper, "wanted to talk" to him. Hohnwald met with appellant and Cooper at his trailer on Tuesday, June 27, at which time Cooper "told" Hohnwald "about the plan to kill Lance Corporal Meyer...." Cooper told Hohnwald that he wanted to quiet Meyer because he knew of Cooper's allegedly stabbing some person in New York City in April who had "ripped [Cooper] off" when Cooper had tried to buy a silencer for a handgun. In his pretrial statement, however, appellant indicated that the real motivation was that Cooper "did not like MEYER over and [sic] incident where a friend of ours named TRAHAN was court-martialed over something that happened between him and MEYER and we felt MEYER back-stabbed TRAHAN."

5. Hohnwald was asked about appellant's apparent role at this early point, and replied as follows:

Q. Was he [appellant] going to be a part of this?

A. Not in the killing itself.

Q. What did he say he was going to be a part of?

A. Just there to help him [Cooper] in case anything happened.

Q. Well, was he going to do anything else?

A. Not that I—nothing else was stated as to what anyone was going to do.

Q. But he stated he was going to be present?

A. That he was going to be there if they needed him, but he didn't say he was going to do anything.

6. The next day, Wednesday evening, the three met and "talked about it again," this time at Cooper's trailer. The deed was scheduled for Thursday night. When asked about appellant's involvement at that point, Hohnwald testified as follows:

Q. What was the conversation like in the trailer that night?

A. Well, again, Sergeant Cooper did the majority of the talking in that he said that he wanted to kill Lance Corporal Meyer and that he was going to slice his throat in the kitchen.

Q. Why in the kitchen?

A. Easier to clean up.

\* \* \*

Q. What else was discussed?

A. At that time, it was decided that the truck would be taken to Tennessee by Lance Corporal [sic] Wright, and that Sergeant Cooper was going to kill PFC [sic] Meyer, and that they would both leave on Friday, which would have been the next—day after he was supposed to be killed.

\* \* \*

Q. Now, did PFC Wright say that he was going to go along with this?

A. He never said he was going to kill Meyer. He just said about the truck—he just talked about the truck [Meyer's truck].

Q. What did he say specifically about the truck?

A. That it was being brought up to Tennessee to a chop shop in Nashville.

Q. He said he was going to do that?

A. Right.

Q. Did he say he was going to help do anything with the body?

A. Get rid of it that night.

Q. Did they say where?

A. At the county dump, I believe.

Q. So, as far as you know, PFC Wright wasn't actually going to do the killing of Meyer, right?

A. Right.

Q. But he was going to be there?

A. Right.

7. Hohnwald explained that Cooper was going to lure Meyer to Cooper's trailer the next evening at 8:00 on the ruse of offering to repay money that he owed Meyer, "and that would be the time that Sergeant Cooper would kill him, was when he came over to pick his money up." While, earlier, all this had seemed more like a "joke" to Hohnwald, he became "convinced" Wednesday night that they were serious. He said that what convinced him were "the details that were being brought out more as to how it was going to be done and what was going to be done with his body."

8. Realizing that "it was getting too out of hand" and that "it wasn't a joke any more," Hohnwald went to the county sheriff's office on Thursday afternoon and reported the plan. They, in turn, handed Hohnwald over to the Naval Investigative Service (NIS), who made arrangements to secrete Meyer and for Hohnwald to go to Cooper's trailer that night, as scheduled.

9. Hohnwald arrived between 7:00 and 7:30 p.m. The three talked about "what was going to go on" once Meyer arrived. Appellant was "still a part of the agreement to do this." At some point, Cooper "brought out two weapons that we—he stated that we could use if anything got out of hand." Appellant and Hohnwald each picked up a weapon—which was a stick with a spike nail on it—and they "play[ed] with them."

10. Meyer, of course, never showed up. Hohnwald suggested that he and appellant try to find Meyer, so the two drove around to several bars, looking unsuccessfully.

11. On cross-examination, Hohnwald described appellant as peaceful, not violent; he indicated his belief that appellant would not have participated "directly in the killing." He reiterated that it "was already stated that Sergeant Cooper was the one that was going to kill him. We were just there in case anything happened, in case it got out of hand."

12. The next day, after being apprehended, appellant made a sworn written statement that was admitted into evidence as prosecution exhibit 1. That evidence adds somewhat to the picture of the plan, and in relevant part it contains the following:

> Sometime around Monday morning, the 26th of JUN89, I WAS AT work in the tool room at my squadron. I began talking with Sgt COOPER when COOPER began talking about LCpl MEYER pissing him off and he was going to get him. I asked him what he was talking about and he said something to the effect of he was going to kill him and was going to stick him. We joked about it throughout the day but I never took it serious. I didn't see COOPER that night or during the day on Tuesday, but on Tuesday night, COOPER came to my room in the barracks. We sat around and COOPER told me he had asked MEYER to come to his house at eight o'clock on Thursday and he hoped I got off work early enough to be at his trailer. I had told COOPER right before this that I had it out with Top at work and come Friday, I was going to be gone because I was fed up with it. COOPER told me that he could do MEYER and I could take MEYER's truck with me because I don't have a car. *I realized at this time that COOPER was serious about killing MEYER.* COOPER never asked me to help him kill MEYER, but *he did ask me to help him get rid of the body, which I agreed to.* COOPER told me to try and get off work early enough to get to his trailer. . . . [On Thursday evening, w]e went to COOPER's trailer and we were the only ones there. HOHNWALD showed up around seven o'clock and we *just sat around waiting for MEYER to get* there. Nothing was really said about MEYER except that *he [presumably, Cooper] felt like a vulture waiting for his prey.* The neighbors came over and MEYER never showed up. Around eight thirty COOPER said it looked like MEYER was not going to show up and that is when he started calling the barracks and work to see where MEYER was at. . . .

\* \* \*

Q. DID COOPER ask you to help him kill MEYER?

A. No.

Q. Did COOPER plan on killing MEYER himself?

A. Yes.

Q. *How DID COOPER want you to help?*

A. *All he wanted me to do was help him get rid of the body.*

Q. *If COOPER would have killed MEYER last night, would you have helped him get rid of the body?*

A. *I suppose, I planned on it,* but I can't say right now.

\* \* \*

Q. Do you believe COOPER would have killed MEYER if he showed up last night?

A. Yes.

(Emphasis added.)

## II

13. Our standard of review on a question of legal sufficiency of the evidence is whether, considering the evidence in the light most favorable to the Government, a reasonable factfinder could find each element of the offense beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. at 319, 99 S.Ct. at 2789. In the context of the defect in the evidence that specifically is asserted here, the Government has correctly stated the yardstick:

There must be evidence in this case which, taken in the light most favorable to the Government, could convince a reasonable court member that appellant possessed the mental state required for the offense which was the object of the criminal conspiracy. *Ingram v. United States,* 360 U.S. 672, 79 S.Ct. 1314, 3 L.Ed.2d 1503 (1959); *United States v. Harrelson,* 766 F.2d 187 [816] (5th Cir.1985), *cert. denied,* 474 U.S. 1034 [106 S.Ct. 599, 88 L.Ed.2d 578] (1985).

Answer to Final Brief at 3–4. *See* 2 W. LaFave and A. Scott, *Substantive Criminal Law* § 6.4(2) at 78 (1986).

14. The offense underlying the conspiracy that is the subject of appellate complaint here is premeditated murder. *See* Art. 118(1), UCMJ, 10 USC § 918(1). "Premeditated murder is murder committed after the formation of a specific intent to kill someone and consideration of the act intended."

Para. 43c(2)(a), Part IV, Manual for Courts–Martial, United States, 1984. Thus, our inquiry relates to evidence that appellant shared in a specific intent to kill Meyer and consideration of that act.

15. We are satisfied that there is evidence in this record from which a reasonable factfinder could find such a state of mind beyond a reasonable doubt. It well may be, as some of the evidence suggests, that appellant himself was rather peaceful and passive, possibly unable personally to wield an instrument of death. That personal lack of stomach for actually bloodying his hands, however, is not the end of the matter.

16. Appellant's own pretrial statement acknowledged that he realized on Tuesday night that Cooper was entirely serious in his chatter about killing Meyer Thursday night. While all the evidence indicates that Cooper fully intended to wield the murder weapon alone, without active help from appellant in doing the dirty deed itself, the evidence also indicates that appellant agreed to be present in case anything should happen that required his intercession and, further, that appellant agreed to help Cooper get rid of the body. *Cf. United States v. Mukes,* 18 MJ 358, 359 (CMA 1984) (conspiracy requires "intent to join the conspiracy, not ... that he was merely present when the crime was committed"); *United States v. Harrelson,* 766 F.2d 186 (5th Cir.1985) (murder conspirator must have the requisite intent to murder).

17. In short, the evidence was sufficient from which reasonable factfinders could find that, while there appears to have been a leader and a follower in this scheme, both of them specifically intended that Meyer be killed and both gave consideration to that intended act.

18. Appellant seeks to avoid this result by seizing upon what he claims to be "the conditional nature of the agreement, if any." Reply Brief at 2. With narrowed blinders, appellant focuses on this perceived defect by quoting from the dissenting opinion below, which concluded that, "if [appellant] had any criminal intent at all, it was limited to the intent to be an accessory after the fact *in the*

*event that* the alleged principal conspirator committed the murder." Unpub. op. at 5.

19. While Judge Freyer surely is entitled to this view of the evidence as his construction of the facts, we have no similar luxury when weighing the evidence as a matter of law. Instead, we believe that the evidence is fully satisfactory, against this standard, to show that appellant had no doubt of Cooper's intent to kill Meyer—in other words, that there simply was no condition precedent that was unlikely to be fulfilled. *Compare United States v. Dworken,* 855 F.2d 12, 19 n. 6 (1st Cir.1988) (condition precedent obviates conspiracy where "virtually no chance that the condition would be fulfilled" exists), *with United States v. Anello,* 765 F.2d 253, 262 (1st Cir.1985) (conditional agreement is sufficient for conspiracy purposes if party "believes the condition likely to be fulfilled").

20. Moreover, recall that appellant agreed not just to be present in case he was needed in the actual killing but also to help Cooper dispose of the corpse. In this connection, appellant does himself in when he concedes that if he—understanding Cooper to be serious about killing Meyer[, which he candidly admitted in his pretrial statement]—agreed to help by cleaning up after the fact [which he also candidly admitted], he would be liable for the conspiracy notwithstanding the fact that his contemplated role was to aid and abet vice to participate in the actual killing and even though his duties would arise only if Cooper successfully dispatched Meyer. In such instance, there would have been a meeting of the minds and the only thing conditional about the conspiracy would have been the fact that Appellant would have to perform only in the event Cooper was successful. Reply Brief at 3. Enough said.

### III

The decision of the United States Navy–Marine Corps Court of Military Review is affirmed.

Chief Judge SULLIVAN and Judges COX, CRAWFORD, and GIERKE concur.