UNITED STATES

v.

Michael L. CURRY, 256 08 5519
Lance Corporal (E–3), U.S.
Marine Corps.

NMCM 9500016.

U.S. Navy–Marine Corps
Court of Criminal Appeals.

Sentence Adjudged 17 April 1993.

Decided 8 April 1997.

Maj R.K. Stutzel, USMC, Appellate Defense Counsel.

LCDR John R. Livingston Jr., JAGC, USN, Appellate Government Counsel.

Before DOMBROSKI, KEATING and LUCAS, JJ.

KEATING, Senior Judge:

The appellant was convicted, contrary to his pleas, of conspiracy to commit premeditated murder, premeditated murder, robbery, and kidnapping. All of the offenses arose out of the shooting death of Lance Corporal Rodney L. Page, U.S. Marine Corps, with a shotgun. The appellant, one of six individuals involved in the incident, was sentenced to a dishonorable discharge, confinement for life, forfeiture of all pay and allowances and reduction to pay grade E–1. The convening authority approved the sentence, but suspended confinement in excess of 30 years for the period of confinement actually served. The appellant raises several assignments of error,[1] two of which merit discussion.

1. I. THE MILITARY JUDGE ERRED WHEN HE DENIED THE DEFENSE'S MOTION TO SUPPRESS TWO LETTERS (PROSECUTION EXHIBIT 1) UNLAWFULLY SEIZED FROM APPELLANT'S BARRACKS ROOM.

II. THE EVIDENCE IS INSUFFICIENT TO ESTABLISH A CONSPIRACY TO COMMIT MURDER, OR THAT APPELLANT WAS GUILTY OF ANY OF THE OFFENSES AGAINST LANCE CORPORAL PAGE AS AN AIDER AND ABETTOR.

III. THE SENTENCE, AS APPROVED AND PARTIALLY SUSPENDED BY THE CONVENING AUTHORITY, IS INAPPROPRIATELY SEVERE.

IV. APPELLANT WAS DENIED HIS RIGHT TO SPEEDY TRIAL NOT MORE THAN 120 DAYS AFTER PREFERRAL OF CHARGES BECAUSE ALTHOUGH DEFENSE ACQUIESCED IN TRIAL DATE, THE DELAY IS NOT ATTRIBUTABLE TO THE ACCUSED. (Citations and footnote omitted.)

V. THE CHARGES WERE IMPROPERLY REFERRED TO TRIAL BECAUSE THEY WERE PREFERRED BY A PERSON, PROBABLY A CLERK, WHO NEITHER HAD PERSONAL KNOWLEDGE OF THE ACCUSED NOR SUFFICIENT INFORMATION ABOUT THE OFFENSES.

VI. APPELLANT'S RIGHT AGAINST SELF–INCRIMINATION WAS VIOLATED WHEN HE WAS ORDERED TO SUBMIT HANDWRITING SAMPLES, AN ACT WHICH OCCURRED OUTSIDE THE PRESENCE OF HIS ATTORNEY. (Citations omitted.)

## The Suppression Motion

The Camp Lejeune military police went to a barracks room after they received a phone call that they believed said something about murders taking place in 15 minutes. They knocked on the door, and received no answer. The police then lifted one of the military policemen up so that he could look into the room through a gap in the top of the curtains. From this position, he saw a man lying motionless on the bed. The police knocked again, but the man did not respond.

They entered the room with a pass key and found the appellant laying face up with his wrists slashed and bleeding. They also found a razor blade on the floor. They applied first aid to the appellant and called for an ambulance. One of the military police noticed several sheets of paper folded and inserted in a bracket of the nearby desk. He opened them and found two notes handwritten by the appellant that incriminated him in the murder of Lance Corporal Page, that had occurred one week earlier.

The defense moved to suppress the two letters, but the military judge ruled that looking into the room from a public sidewalk was not a search, and that the police entry into the room was lawful as an emergency search to save a life and admitted the notes into evidence. The appellant now argues that the military judge's findings of fact and law were clearly erroneous in several respects, and require reversal of the findings and sentence. The appellant alleges first that the military judge erred when he ruled that it was not a search when the military police looked through the window into the appellant's room.

### Standing To Contest The Search

■ Fourth Amendment rights are personal. To be entitled to object to the admissibility of evidence obtained from a search, an accused must have a reasonable expectation of privacy in the place searched. *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); MIL. R. EVID. 311(a)(2). The accused has the burden of establishing that he had a reasonable expectation of pri-

vacy in the area being searched. *Rawlings v. Kentucky*, 448 U.S. 98, 104, 100 S.Ct. 2556, 2561, 65 L.Ed.2d 633 (1980); *Rakas*, 439 U.S. at 131 n. 1, 99 S.Ct. at 424 n. 1; *United States v. Miller*, 13 M.J. 75, 77 (C.M.A.1982). Once an accused who has a reasonable expectation of privacy makes a timely motion to suppress or otherwise objects to introduction of the evidence, the burden shifts to the prosecution to prove that the evidence was not obtained as the result of an unlawful search or seizure. MIL. R. EVID. 311(e)(1).

In framing the issue of expectation of privacy, military courts have generally followed civilian case-law precedent. DAVID L. SCHLUETER, MILITARY CRIMINAL JUSTICE: PRACTICE AND PROCEDURE § 5–3(A) (4th ed. 1996). The Supreme Court has held that for an inspection to be a search subject to the Fourth Amendment, two conditions must be met: (1) the occupant must have a subjective expectation of privacy; and, (2) the expectation of privacy must be one "that society is prepared to honor." *California v. Ciraolo*, 476 U.S. 207, 211, 214, 106 S.Ct. 1809, 1811, 1813, 90 L.Ed.2d 210 (1986); *see also Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967)(Harlan, J., concurring); *United States v. Portt*, 21 M.J. 333, 334–35 (C.M.A.1986).

■ If either component is missing, there is no reasonable expectation of privacy and the accused has no standing to contest the legality of the search or seizure. *See* SCHLEUTER § 5–3(A). In this case, the appellant made a suppression motion and the military judge entered essential findings of fact. Unknown to him at the time, however, was the fact that the accused himself was the person who made the phone call to the military police. This information was disclosed by the accused when he testified on the merits as part of the defense case in chief. Had this information been known, the military judge would have been presented with the preliminary issue of whether the accused had exhibited an actual (subjective) expectation of privacy.[2]

---

2. Reliance on this requirement alone, however, may not be sufficient to resolve the issue. A majority of the Supreme Court has cautioned that in some situations that formulation "would provide an inadequate index of Fourth Amendment protection." *Smith v. Maryland*, 442 U.S.

## Scope of Review

■ An equally problematic question is whether an appellate court can consider trial evidence in resolving a Fourth Amendment suppression motion that the appellant claims was erroneously decided against him. The Supreme Court has held that an appellate court may consider trial evidence in resolving a claim that a motion to suppress based on the Fourth Amendment was erroneously denied, at least when the "record does not make it clear what evidence was produced in support of or against the motion." *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925).[3] The Supreme Court has also held that if the evidence results from the appellant's testimony at trial following the erroneous denial of a motion to suppress, the Government must show that the use of the wrongfully introduced evidence did not induce the testimony. *Harrison v. United States*, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968).

■ Therefore, we are of the view that even if an appellate military court may consider trial evidence in determining whether the military judge erroneously denied a Fourth Amendment suppression motion, it may not do so when it is clear from the record what evidence the military judge relied on in determining the factual issues, and unless the government shows that the erroneous denial of the motion to suppress did not induce the testimony of the accused that the government intends to rely upon. *See* MIL. R. EVID. 311(d)(4); R.C.M. 905(d). "We do not subscribe to the bootstrap argument that the defendant's apparent attempt to mitigate the effect of the already improperly admitted evidence may be used to render the evidence admissible." *Commonwealth v. Benoit*, 382 Mass. 210, 415 N.E.2d 818 (1981).

Finally, the Court of Appeals for the Armed Forces appears to have adopted the view that an appellant is not estopped on appeal from complaining about the erroneous admission of evidence on Fourth Amendment grounds, assuming a timely objection at or before trial, even if he later gave testimony at trial admitting to some of that evidence. The court has held that an accused did not waive an error by the military judge in admitting evidence by entering into a stipulation of fact as to some of that evidence following the erroneous denial of a motion in limine. *United States v. Zakaria*, 38 M.J. 280, 284 (C.M.A.1993). Thus, the scope of our review extends only to the facts and circumstances that were known to the military police at the time they entered the room. *Cf. United States v. Korda*, 36 M.J. 578, 581 (A.F.C.M.R.1992).

## Plain–View Observations

■ Military case law makes clear that law enforcement authorities may, when positioned in a location to which the general public has ready access, peer through partly-covered windows into barracks rooms. *United States v. Wisniewski*, 21 M.J. 370, 372 (C.M.A.1986); *United States v. Lewis*, 11 M.J. 188, 191 (C.M.A.1981); *see also United States v. Dunn*, 480 U.S. 294, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987); *Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). Such plain-view observations, when made by an officer located properly in a position to have such a view, do not constitute unreasonable searches under the Fourth Amendment. *Id.*

■ The appellant argues that the plain-view doctrine does not apply because the officer had to climb up in order to look through an open space in the curtains that was well above eye-level. He argues, accordingly, that this observation was a search, conducted without probable cause, and formed an unlawful basis for entry into the room. The Government does not address the plain-view issue, and we find no clear guidance in military law as to whether the plain-view doctrine can be extended to cover

735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979). *See also*, WAYNE R. LAFAVRE, SEARCH AND SEIZURE, A TREATISE ON THE FOURTH AMENDMENT § 2.1(c)(3rd ed. 1996).

**3.** One lower federal court has said citing *Carroll* that it "is settled law that the validity of an arrest

or search can be supported by evidence which was adduced at trial even though this was not presented at the pretrial suppression hearing." *United States v. Canieso*, 470 F.2d 1224, 1226 (2d Cir.1972) (citations omitted).

a situation such as this where the opening through which the authorities looked was in an area open to the public, but well above eye-level.

The Supreme Court, in an early case held that, in the absence of an emergency, police officers who were lawfully in the hallway of a rooming house and who looked over the transom to observe illegal activities, were required to obtain a search warrant before entering the room to arrest the defendant. *McDonald v. United States*, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948). Justice Jackson, in his concurring opinion, objected to the police having broken into the rooming house but not to their method of observation. "Like any other stranger, they could then spy or eavesdrop on others without being trespassers. If they peeped through the keyhole or climbed on a chair or on one another's shoulders to look through the transom, I should see no grounds on which the defendant could complain." *Id.* at 458, 69 S.Ct. at 194 (Jackson, J., concurring).

McDonald, however, was decided well before the Court redefined the scope of the Fourth Amendment in *Katz*. The Court today would analyze the police officers' method of observation in terms of the defendant's (actual) subjective expectation of privacy and whether that expectation is reasonable. A majority of the Court would require not only that the police be in a place where they had a right to be, but also, in the case of an individual's home, that the place be one from which the public would regularly look into the home. This additional requirement has not been applied, however, in circumstances where the Court has recognized that reduced expectations of privacy apply.

In *California v. Ciraolo*, the Supreme Court decided that the police did not violate the Fourth Amendment when they made a naked-eye observation from an airplane flying in navigable airspace over Ciraolo's partially-enclosed backyard in order to see if he was cultivating marijuana. The Court held that simply because an individual has taken measures, such as building a fence, to restrict some views of his activities, this does not preclude a law enforcement officer from making an observation from a public vantage point where the officer has a right to be and from which the activities are clearly visible. *Ciraolo*, 476 U.S. at 213, 106 S.Ct. at 1812.

Subsequently, in *Florida v. Riley*, 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989), the Court upheld a similar inspection for marijuana made from a helicopter at an altitude below the lower limit established for fixed-wing aircraft, but at an altitude where the FAA permitted helicopters to fly. *Id.* at 451, 109 S.Ct. at 697. Because there was no indication that such helicopter flights were a rarity, the Court held that the respondent could not reasonably have expected that his greenhouse would not be observed with the naked-eye from that altitude.

In *Riley*, however, Justice O'Connor made clear that her deciding vote was based not on the fact that the helicopter was positioned in a place where it had a right to be, but on the additional fact that there was reason to believe there was considerable public use of the airspace in question, and Riley had introduced no evidence to the contrary. *Id.* at 455, 109 S.Ct. at 699 (5–4 decision)(O'Connor, J., concurring in judgment).

The four dissenting justices agreed with Justice O'Connor that the decision should turn on whether Riley had a reasonable belief that no such surveillance would occur, and not on the fact that the helicopter was flying at a lawful altitude under FAA regulations. *Riley*, 488 U.S. at 464, 109 S.Ct. at 704 (Brennan, J., dissenting); 488 U.S. at 467, 109 S.Ct. at 705 (Blackman, J., dissenting). The dissenting Justices disagreed with Justice O'Connor's factual conclusion that there was "considerable" public air-traffic at the altitude in question and the question of who should bear the burden of proof.

The decisions in *Ciraolo* and *Riley*, taken together, support the appellant's argument that the plain-view doctrine does not apply in his case because, although the police were in a place where they had a right to be, there was no reason to believe that the public would regularly look through an open gap in the curtains several feet above eye-level. However, both *Ciraolo* and *Riley* involve police surveillance of an individual's home where the expectation of privacy that society

is willing to recognize as reasonable is at its greatest. Under other circumstances, the Fourth Amendment recognizes only a reduced expectation of privacy. *See Dow Chemical v. United States*, 476 U.S. 227, 106 S.Ct. 1819, 90 L.Ed.2d 226 (1985).

## Reduced Expectation of Privacy

As Justice Harlan explained in his concurring opinion in *Katz*, the Fourth Amendment protects people, not places. The question is what protection it affords to those people. "Generally, as here, the answer to that question requires reference to a 'place'." *Katz v. United States*, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967)(Harlan, J., concurring). The Supreme Court held in *Katz* that an enclosed telephone booth is an area where, like a home, and unlike a field, a person has a constitutionally protected reasonable expectation of privacy. *Id.* at 360, 88 S.Ct. at 516.

Later decisions of the Court have recognized a constitutionally protected reduced expectation of privacy. There are places, such as outdoor industrial facilities, where "[t]he intimate activities associated with family privacy and the home and its curtilage simply do not reach." *Dow*, 476 U.S. at 236, 106 S.Ct. at 1825. In such circumstances, the Government has greater latitude to conduct warrantless inspections because "the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home." *Dow*, 476 U.S. at 237–38, 106 S.Ct. at 1826 (quoting *Donovan v. Dewey*, 452 U.S. 594, 598–99, 101 S.Ct. 2534, 2537–38, 69 L.Ed.2d 262 (1981)).

Similarly, reduced expectations of privacy for motor vehicles derive from the pervasive regulation of vehicles capable of traveling on the public highways. *California v. Carney*, 471 U.S. 386, 392, 105 S.Ct. 2066, 2069, 85 L.Ed.2d 406 (1984)(citing *Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973)). "Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements." *South Dakota v. Opperman*, 428 U.S. 364, 368, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976). The public is fully aware that it

is accorded less privacy in its automobiles because of this compelling governmental need for regulation. *Carney*, 471 U.S. at 392, 105 S.Ct. at 2069.

The Court has thus recognized a middle ground between the home, where society most readily accepts expectations of privacy as reasonable, and open fields, where an individual may not legitimately demand privacy. A similar analysis can be applied to determine reasonable expectations of privacy in the military setting. A military barracks is not a place intended for the intimate activities associated with family privacy. It is subject to pervasive and continuing governmental regulations and controls, including periodic inspections. On the other hand, a barracks room is not completely devoid of privacy like an open field.

## Privacy In The Military Setting

The Supreme Court has long recognized that the rights of servicemembers must be conditioned to meet overriding demands of discipline and duty. *Parker v. Levy*, 417 U.S. 733, 744, 94 S.Ct. 2547, 2556, 41 L.Ed.2d 439 (1974); *see also Middendorf v. Henry*, 425 U.S. 25, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976); *Schlesinger v. Councilman*, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975). It is therefore foreseeable that reasonable expectations of privacy within the military society will differ from those in the civilian society. *United States v. Middleton*, 10 M.J. 123, 127 (C.M.A.1981)(holding that servicemembers have no reasonable expectation of privacy in areas which are subject to military inspection); *United States v. McCarthy*, 38 M.J. 398 (C.M.A.1993).

In *McCarthy*, the United States Court of Military Appeals (now the Court of Appeals for the Armed Forces) upheld a warrantless arrest of an individual in a barracks room, concluding that "a barracks/dormitory room does not provide the same sanctuary as the threshold of a private home." *McCarthy*, 38 M.J. at 403. The *McCarthy* court pointed out that the "military authorities have a relationship with and responsibility for persons and property unlike anything in civilian life. A military commander is not only responsible

for the barracks building and its contents; he is also responsible for the welfare of its occupants." *Id.* at 403; *see also United States v. McCormick,* 13 M.J. 900, 904 (N.M.C.M.R.1982).

▇▇▇▇ The appellant in this case claims a reasonable expectation of privacy in his military barracks room. The Fourth Amendment analysis is the same whether the issue is an arrest without a warrant or a search resulting in a seizure. *McCarthy,* 38 M.J. at 400 (citing *Payton v. New York,* 445 U.S. 573, 589, 100 S.Ct. 1371, 1381, 63 L.Ed.2d 639 (1980)). We need not read *McCarthy* to say that there is no circumstance under which a military member would have a reasonable expectation of privacy in a military barracks room to conclude that this appellant had, at least, a reduced expectation of privacy in his barracks room. Therefore, we will apply by analogy the *Dow* reduced expectation of privacy standard in determining whether surveillance of a servicemember in a military barracks room constitutes a Fourth Amendment search.

First, we note that during the observation there was no physical entry into the room, and the police made their observation with the naked-eye, unaided even by a camera as was permitted in *Dow. See Dow,* 476 U.S. at 229, 106 S.Ct. at 1822. They did not use highly sophisticated surveillance equipment, such as satellite technology, that is not generally available to the public to look into the room. *See id.* at 231–32, 106 S.Ct. at 1823–24. Second, the police looked from a place, a public sidewalk, where they had a right to be, although not at a height from which the public would regularly be expected to look into the room. This latter factor would be determinative if the observation were of a home or its curtilage, but not in a place where one would have a reduced expectation of privacy. *Compare Ciraolo,* 476 U.S. at 207, 106 S.Ct. at 1809 *and Riley,* 488 U.S. at 445, 109 S.Ct. at 693 *with Dow,* 476 U.S. at 227, 106 S.Ct. at 1819.

Since the appellant had a reduced expectation of privacy in the barracks room, *McCarthy,* 38 M.J. at 403, the observation by the police through the gap at the top of the curtains from a place where they had a right

to be and without physical intrusion was not a search within the meaning of the Fourth Amendment. *Cf. United States v. Hendrickson,* 940 F.2d 320 (8th Cir.), *cert. denied,* 502 U.S. 992, 112 S.Ct. 610, 116 L.Ed.2d 633(1991)(commercial storage unit distinguished from home or curtilage; no reasonable expectation of privacy where manager stood on a ladder and looked through wire screen near the ceiling). Accordingly, we hold that the military judge did not abuse his discretion in ruling that the observation was not a search.

### Warrantless Entry Into The Room

▇▇▇▇ We must next decide whether the warrantless entry by the military police into the appellant's room was conducted "in a good faith effort to render immediate medical aid, to obtain information that will assist in the rendering of such aid, or to prevent immediate or ongoing personal injury." Mil. R. Evid. 314(i). The military judge found that it was and we agree. The Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid. *Mincey v. Arizona,* 437 U.S. 385, 392, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978).

The police lieutenant testified that he observed a man lying motionless on his back, with his palms up, and not responding when the police knocked. He was also aware that approximately one suicide, or suicide gesture, occurred every week at Camp Lejeune. We find these facts to be more than adequate to support the officer's belief that an emergency existed and to justify a warrantless entry into the appellant's room. *See United States v. Atkins,* 17 M.J. 970, 971 (A.C.M.R.1984).

The justification for entry was not diminished by the police officers' decision to send for the key to the room prior to observing the appellant's comatose condition. The question is whether there was "evidence which would lead a prudent and reasonable official to see a need to act." *United States v. Mons,* 14 M.J. 575, 581–82 (N.M.C.M.R.1982)(quoting *United States v. Rodriguez,* 8 M.J. 648, 652 (A.F.C.M.R. 1979)), *petition denied,* 15 M.J. 445 (C.M.A.

1983). We hold that the advance preparations these police officers made did not undermine the validity of their objectively reasonable decision to enter the room based upon what they saw.

### Seizure Of The Letters In Plain–View

■ The appellant contends, however, that once in the room, the military police were not justified in seizing and reading the letters left by the appellant in a location where they could be easily seen, one of which was addressed "to whom it may concern" and the other to his family. Prosecution Exhibit 1. The military judge found that these letters had been seized and read as part of the emergency entry to protect the life and safety of the accused, and not to further a criminal investigation or in bad faith.

We agree and conclude that the discovery of the letters was not the result of a search for incriminating evidence against the appellant, but of a measure taken to obtain information that would assist in rendering immediate medical aid. *See* MIL. R. EVID. 314(i). Nothing in the Fourth Amendment requires the police to obtain a warrant in such circumstances. *United States v. Yarborough*, 50 C.M.R. 149, 1975 WL 15560 (A.F.C.M.R. 1975); *see Harris v. United States*, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968); *see also United States v. Escobedo*, 11 M.J. 51 (C.M.A.1981)(concluding that a police officer, lawfully on the premises, may seize an object seen in plain view without a warrant). Accordingly, the military judge did not err when he denied the defense motion to suppress the two letters seized from the appellant's barracks room.

### Proof Of The Conspiracy

■ The appellant does not contest the essential facts leading up to, during, and following the killing of Lance Corporal Page. Instead, he strongly denies planning the killing or even desiring that it take place, and therefore disclaims any criminal intent. Appellant's Brief at 11. Intent, however, is usually established by evidence that certain results follow naturally and probably from the action that was taken. *United States v. Johnson*, 24 M.J. 101, 105 (C.M.A.1987). This may be so "regardless of any desire, purpose or motive to achieve the result." *Id.*

*See also United States v. Vega*, 39 M.J. 79, 81 (C.M.A.1994).

■ Thus it is not necessary that the appellant planned the killings or that he desired Lance Corporal Page's death as long as he agreed with the others to commit the crime. The existence of a conspiracy is generally established by circumstantial evidence and is usually manifested by the conduct of the parties themselves. *United States v. Matias*, 25 M.J. 356, 362 (C.M.A.1987). The fact that the appellant agreed to the criminal objectives of the conspiracy was amply demonstrated in this case by his behavior before, at the time of, and after the crimes were committed.

Even if we were to accept the appellant's version of the facts, we would conclude that, although he may not have been the driving force that ultimately brought about the death of Lance Corporal Page, he knew what the plan was, agreed with the others to carry it out, and actively participated in a series of steps that brought it to culmination. Although his personal motivation to enter into the conspiracy may have been limited, he well understood its broader purpose and he never abandoned or withdrew from the agreement. *See United States v. Graalum*, 19 C.M.R. 667, 1955 WL 3501 (A.F.B.R.1955)(finding that a conspiracy, once established, may be inferred to continue until the contrary is established).

■ An effective withdrawal or abandonment must consist of affirmative conduct that is wholly inconsistent with adherence to the unlawful agreement and that shows the party has severed all connections with the conspiracy. *United States v. Hubble*, 36 M.J. 780 (A.C.M.R.1993); *see also United States v. United States Gypsum Co.*, 438 U.S. 422, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978)(suggesting three factors to consider before concluding that an effective withdrawal has taken place: (1) notification to each member; (2) disclosures to law enforcement officials; and (3) acts inconsistent with the object of the conspiracy).

The appellant may have had his own reasons for participating in the plan that he and the others agreed to, but his actions were

always consistent with adherence to the unlawful agreement. *See also United States v. Coker*, 13 C.M.R. 459, 464, 1953 WL 2480 (A.B.R.1953)(concluding that the "[a]cts of the parties ... speak louder than words" in a conspiracy). Having agreed to the unlawful objective of the conspiracy and never having severed his connection with it, he became legally responsible for its criminal actions.

## Conclusion

We have considered the remaining assignments of error, and the Government's response thereto, and conclude that the findings and sentence are correct in law and fact and that no error materially prejudicial to the substantial rights of the appellant was committed. We specifically find the sentence, as approved and partially suspended by the convening authority, to be an appropriate one.

Accordingly, the findings of guilty and sentence, as approved on review below, are affirmed.

Chief Judge DOMBROSKI concurs.

LUCAS, Judge (concurring):

I fully concur in the majority's ultimate resolution of the case. I comment separately only with respect to certain aspects of the first and second assignments of error.

I stress some of the facts pertaining to the first assigned error because they lead me in a slightly different direction from the majority down the Fourth Amendment path. Two facts seem critically important. First, not only did the phone call to the military police refer to murders, the caller advised the police to go to the appellant's barracks room. Second, the appellant made that call, although he did not identify himself to the military police. Although introduced later at trial, evidence of the identity of the caller was not made available to the trial judge during litigation of the suppression motion. However, in resolving the issue of whether there was a Fourth Amendment violation in this case, which is a question of law, a *de novo* review of the issue is required by this court and we should not be limited by what facts the parties elected to put before the military judge for the suppression motion.

The record of trial clearly supports the conclusion that the appellant called the military police and invited them to his barracks room. Those facts are directly related to the Fourth Amendment issue.

The Fourth Amendment protects people, not things or places, only from unreasonable official governmental searches and seizures. *Cf. Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The appellant contends that the seizure of incriminating evidence in his barracks room was the result of an unlawful search of that room by military police. The threshold Fourth Amendment question is whether the appellant had a constitutionally protected reasonable expectation of privacy while inside his barracks room after making his call to the military police. Such an expectation existed only if the appellant manifested a subjective expectation of privacy and society is willing to recognize that subjective expectation as reasonable. *Florida v. Riley*, 488 U.S. 445, 449, 109 S.Ct. 693, 696, 102 L.Ed.2d 835 (1989); *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986). See also MIL. R. EVID. 311(a)(2), MANUAL FOR COURTS-MARTIAL, UNITED STATES (1995 ed.).

Even though the blinds and curtains were closed, when the military police arrived at the appellant's room, the appellant had just called the military police and advised them to come to his room to investigate a possible murder. Considering all of the relevant circumstances, I conclude that the appellant had no subjective expectation of privacy after he made the call to the military police. The act of inviting the military police to his room is totally inconsistent with such a concept. In effect, the appellant abandoned whatever privacy expectation might have been recognized when, by the call, he opened himself up for observation and scrutiny by the police. We therefore need not address the issue of whether, in general terms, our society recognizes that a servicemember has a reasonable expectation of privacy when in his or her barracks room.

There being no subjective expectation of privacy while inside his barracks room, there was no Fourth Amendment violation when

the military police lieutenant was lifted up and looked through a small opening at the top of the curtain, or when the military police used a pass-key and entered the locked room, or when one of the military police seized the appellant's two inculpatory suicide notes. There being no Fourth Amendment violation, the suicide notes and any evidence derived from the notes were untainted and properly admitted. I therefore find no merit in the first assignment of error.

I respectfully disagree with only a small part of the majority's opinion regarding the first assigned error. In my opinion, the activity of the military police lieutenant as he looked through the appellant's window was a search, as opposed to what may be referred to as a non-search observation from a public location. Treatment of this issue appears to be evolving and unsettled. My examination of *McDonald v. United States,* 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948), *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), *California v. Ciraolo,* 476 U.S. 207, 106 S.Ct. 1809, 90 L.Ed.2d 210 (1986), *Florida v. Riley,* 488 U.S. 445, 109 S.Ct. 693, 102 L.Ed.2d 835 (1989), *United States v. Wisniewski,* 21 M.J. 370 (C.M.A. 1986), and *United States v. Kaliski,* 37 M.J. 105 (C.M.A.1993), leads me to conclude that there is a subtle movement towards the development of a concept that would classify certain intentional official governmental observations as non-searches and thus exempt from further fourth Amendment analysis. Instead, these special observations are categorized as public views, or plain views from a public area.

In the appellant's case, because his blinds and curtains were closed, the military police could not see through the window as they stood on the common-area walkway that fronted the appellant's room. One of the military police laced his fingers together and lifted the lieutenant a few feet so that the lieutenant could look into the appellant's room through the small gap at the top of the curtain. While this was being done, the military police were still on the common-area walk-way. The majority appears to classify this police activity as a nonsearch, plain view from a public area. It seems to me that the cases cited above on the issue, when read together, stand for the proposition that, for the public view doctrine to apply, especially when the police observation is of a person's living area, the observer has to be at a location where the public not only has a right to be but where we would expect the public to be without difficulty.

In the appellant's case, the public had a right to be on that common-area walkway, but we should not expect the public to be routinely lifted up so as to be eye-level with the top of the appellant's window. The result is that the activity by the lieutenant amounted to a search.

However, whether we conclude that the lieutenant's act of looking through the window amounted to a search, although not an unreasonable search because the appellant invited the police to his room, or decide, as I have above, that the appellant had no subjective expectation of privacy because he invited the police to his room, or, as the majority appears to have done, that the activity was not a search at all, the result is the same. There was no Fourth Amendment violation and the contested evidence was admissible.

Although during the suppression motion, the trial counsel presented some evidence on, and contended that, the two suicide letters would have ultimately or inevitably been otherwise lawfully discovered, the trial judge made no essential findings regarding that issue. The record of trial indicates that within hours of being found with both wrists slashed in an apparent suicide attempt, the appellant was treated and medically cleared to be interviewed by agents of the Naval Criminal Investigation Service (NCIS), who had an obvious interest because of the inculpatory nature of the suicide notes. The appellant was properly warned by an NCIS agent and then elected to remain silent but execute a written authorization to search his room. The search was conducted immediately. If we assume that the seizure of the two suicide notes by the military policeman who entered the appellant's room was improper because of a Fourth Amendment violation, because the taint was not sufficiently attenuated at the time the appellant consented to the search of his room by NCIS and because

there was no independent source to justify a lawful seizure of the letters, I conclude that the inevitable discovery doctrine is unavailable to support the admissibility of the contested suicide notes. *Cf. Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); MIL. R. EVID. 311(b)(2). However, because I conclude that there was no fourth Amendment violation leading up to the seizure of the suicide notes, unavailability of the doctrine does not decide the issue and the decision of the trial judge to not address the issue in his essential findings is of no consequence.

The appellant's second assignment of error raises an issue of sufficiency of proof. This court may affirm only such findings of guilty as it finds correct in law and fact. Art. 66(c), Uniform Code of Military Justice, 10 U.S.C. 866(c). The test for legal sufficiency is whether, considering the evidence in the light most favorable to the Government, a rational factfinder could have found all the essential elements of the offense beyond a reasonable doubt. *United States v. Turner,* 25 M.J. 324 (C.M.A.1987). When applying this test, we are bound to draw every reasonable infer-ence from the record in favor of the prosecution. *United States v. McGinty,* 38 M.J. 131 (C.M.A.1993). The test for factual sufficiency is whether, after weighing the evidence in the record and making allowances for not having personally observed the witnesses, we are convinced of the appellant's guilt beyond a reasonable doubt. *Turner,* 25 M.J. at 325. The findings of guilty are legally and factually correct. The appellant makes the same argument made in the very similar case of *United States v. Wright,* 42 M.J. 163 (1995). The appellant claims that he did not share the requisite specific intent to kill. *Id.* at 166. The appellant was not believed at trial and the record of trial supports rejection of such a claim by the trier of fact. Additionally, I do not believe the appellant's claim now. The second assigned error is without merit.